DAVIS, Chief Justice.
[¶1] Ian Sparks was convicted of furnishing two fifteen-year-old girls with alcohol and sexually abusing them. On appeal, he contends that the district court erred in ordering joinder of the sexual abuse charges relating to the two victims. He further contends that the district court erred and violated his confrontation rights and the right to a complete defense when it excluded evidence of a prior false sexual abuse allegation by one of the victims. We affirm.
ISSUES
[¶2] Mr. Sparks presents two issues on appeal, which we restate as follows:
I. Did the district court abuse its discretion in ordering joinder of the sexual abuse charges relating to the two victims?
*1098 II. Did the district court abuse its discretion or infringe on Mr. Sparks' confrontation rights or his right to present a complete defense when it excluded evidence of a prior false sexual abuse allegation by one of the victims?
FACTS
[¶3] In the summer of 2016, DJJ and AK were both fifteen years old and living in Gillette, Wyoming. They had become friends during their participation in Civil Air Patrol that summer, and on July 23, 2016, they made plans for AK to spend the night at DJJ's home. Their plans changed, however, and they instead decided to spend the night with DJJ's former step-sister, Mikelah Williams, and her twenty-three-year old fiancé, Ian Sparks. Mr. Sparks and Ms. Williams had recently moved, so DJJ and AK first went to the apartment they had vacated to assist Mr. Sparks in cleaning it. Afterward, Mr. Sparks drove the girls to the new trailer home he shared with Ms. Williams, stopping along the way to buy vodka, energy drinks, and soda for himself and the girls.
[¶4] It was around 10:00 p.m. when Mr. Sparks and the girls arrived at the trailer he shared with Ms. Williams. He left the vodka in his vehicle and told the girls that because Ms. Williams would be upset about the alcohol, they would wait until she went to sleep to drink it. While the girls watched a movie, Mr. Sparks and Ms. Williams retired to their bedroom. Sometime later, Mr. Sparks came out of the bedroom and told the girls Ms. Williams had finally fallen asleep.
[¶5] Mr. Sparks and the girls then left the mobile home and took the vodka and other drinks to a nearby abandoned trailer. There they passed the vodka around and drank from the bottle. Although AK raised the bottle to her mouth and could taste the alcohol, she only pretended to drink it. DJJ, on the other hand, drank to the point of intoxication. As the three drank, they played a game of "Truth or Dare." AK described how the evening then progressed:
Q. Truth or Dare, how did it start? In what sort of things?
A. Um, so just something stupid, like you have to lick a wall, or stuff like that.
Q. And did there come a time where the game got a little more risqué?
A. Yes.
Q. What did you - can you tell us about that?
A. I think it started daring each other, like kiss each other.
Q. And did there come a point where you and Mr. Sparks got dared to make out?
A. Yes.
Q. Can you tell us about that?
A. [DJJ] dared us to kiss, so we kissed.
Q. Okay. Did you want to follow through with that dare?
A. No.
Q. Why did you?
A. Because I was just playing along and trying to have fun, seem like if I didn't.
Q. When you and Mr. Sparks kissed, were you sitting, or were you standing, or something else?
A. We were sitting.
Q. Okay. And how were you sitting?
A. Like on our knees.
Q. So face-to-face?
A. Yes.
Q. So after - well, how long do you think the kiss with Mr. Sparks lasted?
A. A minute or two.
Q. Okay. Was there any touching at that point?
A. Yes.
Q. What kind of touching?
A. Like my butt and - yeah.
Q. I'm sorry? Your butt and?
A. Um, like my back and my arms.
Q. Okay. Now, after Mr. Sparks kisses you, what happens next?
A. Him and [DJJ] kiss. And then he dares me to kiss him again.
Q. Okay. Now when you see him and [DJJ] kiss, was that the first time that you had seen them kiss?
A. Yes.
Q. Okay. What can you tell us about that kiss?
*1099 A. It lasted like a minute, same with touching.
Q. Okay. Did you see Mr. Sparks and [DJJ] kiss again later that night?
A. Yes.
Q. Okay. Now let's talk about that. When you saw Mr. Sparks and [DJJ] kissing again later, what can you tell us about that?
A. Um, it was very - they were very into it. It lasted a while.
Q. Did they both appear to be sort of getting into it?
A. Yes.
Q. Okay. Was Mr. Sparks touching [DJJ]?
A. Yes.
Q. Where?
A. Everywhere.
Q. And I'm sorry, when you say "everywhere" can you be a little more specific?
A. Yes. Her torso, her breasts, butt, and stuff between her legs.
Q. Her torso, her breasts, her rear end, and between her legs?
A. Yes.
Q. Did you say anything to him at that point?
A. Yeah. I told them that they needed to cool it down.
Q. Why?
A. Because she was really drunk, she didn't know what she was doing, and she probably would have been willing to do anything at that point.
Q. And did Mr. Sparks say anything to you?
A. Yes.
Q. What did he say?
A. He told me that we should let [DJJ] decide what she wanted.
Q. Now, you gave an interview with an officer, a female officer; do you remember that?
A. Yes.
Q. Okay. And in talking with Nicole Long, do you remember indicating that the exact thing that Mr. Sparks said was, "it's up to [DJJ] if she wants to have sex or not."
A. Yes.
Q. Is that what Mr. Sparks said?
A. Yes.
Q. Now, how were [DJJ] and Mr. Sparks when they were getting into it? Were they standing? Were they sitting?
A. They were, like, lying down.
Q. Okay. Now, you indicated that you saw Mr. Sparks touch [DJJ] between her legs; is that right?
A. Yes.
Q. Did you see Mr. Sparks touch anyone else between their legs that night?
A. Yes.
Q. Okay. Who?
A. Me.
Q. What can you tell us about that?
A. It was after I had, like, tried leaving. But - I don't remember if I tried leaving before or after, but he had gotten up and he was, um, asking why I wasn't happy, and said "I could make you happy." And telling me to stay, and let's go have fun. And he was touching me while doing it, and - yeah.
Q. Okay. When he was saying these things, were you guys standing or sitting?
A. Standing.
Q. Okay. Were you face-to-face or something else?
A. Something else.
Q. Okay. And what was that something else?
A. He was faced towards my back.
Q. Okay. So his front would have been touching your back?
A. Yes.
Q. Okay. And had he wrapped his arms around you?
A. Yes.
Q. Okay. And where - well, what part of his body was touching what part of your body?
A. So his torso to my back, his legs to the back of my legs.
Q. Did his hands touch you anywhere?
*1100 A. Yes.
Q. Where?
A. My breasts, my rear end, between my legs.
Q. Now, when you say between your legs, do you mean your vagina?
A. Yes.
Q. Okay. And was this over your clothing or under your clothing?
A. Over.
Q. Was he talking into your ear, or was he just talking normal?
A. In my ear.
Q. He said that he could make you happy?
A. Yes.
Q. How did that make you feel?
A. Gross.
[¶6] A short time later, the three left the abandoned trailer and returned to Mr. Sparks' trailer home. The next morning, AK and DJJ went to a pancake breakfast and then on to DJJ's home. While she was there, Mr. Sparks contacted DJJ and asked her to help him finish cleaning his apartment. DJJ agreed and invited AK to join her, but AK declined. At the apartment, then, only DJJ and Mr. Sparks were present. DJJ described what happened after they started cleaning:
Q. He asked if you remembered what happened last night?
A. Yes.
Q. And what did you take that - what did you take that to mean he was talking about?
A. The drinking.
Q. Okay. And what happened after he asked you that?
A. I had said yes. And then he kept on, like, moving closer. And then I had turned my head and he was like right there, like kind of like really, like, on my shoulder. And then he had kissed me.
Q. Was - well, did you kiss him back?
A. Yes.
Q. Okay. Did he touch you at all -
A. Yes.
Q. -- while you guys were kissing?
A. Yes.
Q. Tell us about that, please.
A. He touched me, like on my breasts and like on my stomach, and on my legs.
Q. And at first was that over the clothes?
A. Yes.
Q. When you say that he was touching your legs, do you mean between your legs, or on your legs?
A. On my legs and between my legs.
Q. Now, so it started with kissing and some touching over your clothes. Did it stop there?
A. No.
Q. Okay. What happened next?
A. He had started to undress me, and I had started to undress him.
Q. Okay. And did you take off - or did you guys take off all of your clothes?
A. No.
Q. What did you leave on?
A. My bra.
Q. Okay. Did Mr. Sparks get fully undressed?
A. Yes.
Q. Okay. What happened after you both got undressed?
A. We had sex.
Q. When you say that you had sex, did Mr. Sparks put his penis inside your vagina?
A. Yes.
[¶7] About a week later, DJJ attended a Bible camp outside Lander, Wyoming. While there, she told friends what had happened with Mr. Sparks, and those friends encouraged her to tell her mother. She also told the camp director what had happened, and when her mother picked her up from camp, she reported the incidents to her. When they returned to Gillette, DJJ's mother took her to the police department to report the incidents. In addition to the acts described above, DJJ reported two additional incidents of sexual intercourse with Mr. Sparks in the week following the July 23rd incident.
[¶8] Following an investigation, the State filed an information charging Mr. Sparks with three counts of second degree sexual *1101 abuse of a minor as to DJJ, one count of third degree sexual abuse of a minor as to AK, and two counts of furnishing alcohol to a minor, with one count for each girl. Following a preliminary hearing, the circuit court bound over all charges but the count for sexual abuse of AK on January 3, 2017. It was not bound over because the State failed to establish AK's age, an element of the offense. On January 13, 2017, the State filed a separate information recharging the count of sexual abuse of a minor in the third degree as to AK, and on March 7, 2017, that count was bound over to district court.
[¶9] On March 22, 2017, the State filed a motion to consolidate the cases for trial and sentencing. Following a hearing, the district court granted the State's motion over Mr. Sparks' objection. In ruling that joinder was appropriate, the court found that the offenses were of similar character in that they involved sexual abuse of minors. The court further found that the acts were part of a connected transaction, though Mr. Sparks' behavior with DJJ progressed further. Finally, the court found that evidence of the offenses would be admissible in separate trials under Rule 404(b), and it expressed its willingness to consider instructions or verdict forms to minimize any prejudice.
[¶10] On October 22, 2017, Mr. Sparks filed a motion to allow him to present evidence concerning DJJ's familiarity with certain sexual acts, a past false allegation of sexual abuse, and a suicide attempt in 2016 pursuant to Wyo. Stat. Ann. § 6-2-312, the rape shield statute. The State opposed the motion, and following a hearing, the district court ruled that the evidence concerning DJJ's familiarity with certain sexual acts and her suicide attempt were inadmissible. As to the alleged prior false accusation of sexual abuse, the court found that Mr. Sparks had presented sufficient information to warrant an in-chambers hearing on the probative value versus unfair prejudice of the proffered evidence. On February 1, 2018, the court held that hearing and found that the evidence had limited probative value and that probative value was substantially outweighed by its potential for prejudice. The court therefore ruled the evidence inadmissible under both W.R.E. 403 and the rape shield statute.[1]
[¶11] Following a three-day trial, a jury convicted Mr. Sparks of one count of second degree sexual abuse of a minor against DJJ, of one count of third degree sexual abuse of a minor against AK, and of both counts of contributing alcohol to a minor. The jury acquitted on two of the counts of second degree sexual abuse against DJJ. The district court sentenced him to concurrent sentences that totaled six to ten years. Mr. Sparks thereafter filed a timely notice of appeal to this Court.
DISCUSSION
I. Joinder
[¶12] We review a district court's decision to allow the joinder of charges for an abuse of discretion. Hereford v. State , 2015 WY 17, ¶ 30, 342 P.3d 1201, 1209 (Wyo. 2015). An abuse of discretion will not be found unless the court acts in a manner that exceeds the bounds of reason. Id ."An abuse of discretion occurs when joinder of separate charges deprived the defendant of a fair trial." Id . (quoting Lessard v. State , 2007 WY 89, ¶ 24, 158 P.3d 698, 704 (Wyo. 2007) ).
[¶13] Rule 8 of the Wyoming Rules of Criminal Procedure provides that multiple offenses, "whether felonies or misdemeanors or both," may be charged in the same information if the offenses charged "are of the same or similar character, are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." W.R.Cr.P. 8(a). Rule 13 allows separately-filed informations to be joined for trial if the offenses charged could have been joined in a single information as allowed by Rule 8. W.R.Cr.P. 13. We have also said:
Joinder of offenses is proper absent compelling reasons for severance, because joint trials serve the public interest in expediting *1102 the administration of justice by reducing docket congestion, conserving the time of judges and juries, and avoiding the need to recall witnesses to provide identical or overlapping testimony. Lessard , ¶ 25, 158 P.3d at 704 ; Bell v. State , 994 P.2d 947, 955 (Wyo. 2000). The prejudice which may result from joining offenses in a single case must be weighed against the judicial economy obtained by joinder. Id .
Hereford , ¶ 31, 342 P.3d at 1209.
[¶14] In addressing whether the charges against Mr. Sparks were proper for joinder, the district court found that the charges were of a similar character because all four charges alleged sexual assault of a minor.[2] The court further found that the charges were part of a connected transaction. It reasoned:
And in the Court's view, the temporal proximity of these alleged events compels the Court to determine that the defendant was engaged in, generally speaking, the same set of acts or transactions. And to be sure, his behavior, allegedly, gradated to a higher degree with J.D.D. - or D.J.J. excuse me, than with A.K., but nonetheless the Court's of the view that the acts are part of a general transaction related in time and involving both of these girls, and it did constitute part of a common, if not a plan, a common sequential undertaking.
[¶15] Mr. Sparks contends the district court erred in finding these offenses proper for joinder because their statutory elements differ and because they occurred on different dates, in different locations, and under different circumstances. We disagree.
[¶16] Rules 8 and 13 expressly allow joinder of felony and misdemeanor offenses, meaning differences in degree or statutory elements are not controlling questions for determining the propriety of the joinder. The offenses plainly do not need to be identical to be joined, and what is instead required is that the offenses be of a similar character, meaning that they bear a "general likeness." 5 Wayne R. LaFave et al., Criminal Procedure § 17.1(b) (4th ed.) (Nov. 2018 Update) (but "the mere fact that the crimes carry different labels is not determinative" of the joinder issue, as if they have "a general likeness" they are still of "similar character") (footnotes omitted); see also Larkins v. State , 2018 WY 122, ¶ 68, 429 P.3d 28, 44-45 (Wyo. 2018) (agreeing with district court that varying abuse charges against co-defendants involved same general accusations even though methods of injury differed). The charges against Mr. Sparks for sexual abuse of DJJ and AK both involved sexual contact with teenage girls. Regardless of the degree of abuse, we can find nothing unreasonable in the district court's conclusion that the charged offenses were of a similar character.
[¶17] We likewise find that the district court could reasonably conclude that the offenses against DJJ and AK were part of a sequence of transactions. Mr. Sparks initiated sexual contact with both girls on July 23, 2016, and that contact was alleged to have progressed and continued with DJJ over the following days. The differences in dates and locations did not render the connection so attenuated as to undercut the district court's view of the events as a continuing sequence of events. See Larkins , ¶ 68, 429 P.3d at 44-45 (agreeing that joinder was proper for multiple counts of child abuse and one count of abuse of a vulnerable adult where charges involved four victims and occurred on different dates and at different locations); Duke v. State , 2004 WY 120, ¶ 41, 99 P.3d 928, 945 (Wyo. 2004) (upholding joinder of murder solicitation charges occurring years apart and involving different victims as part of common scheme).
[¶18] Separate trials on the sexual abuse charges would require testimony in both trials by both victims as to the events that occurred on July 23rd in the abandoned trailer, both victims' mothers as to the dates of events, the same two investigating law enforcement officers, and presumably by Mr. Sparks and Mikelah Williams, who both testified for the defense. Because the offenses charged were of a similar character, involved a sequence of events over the course of a few days, and separate trials would require duplicative *1103 testimony by the same set of witnesses, we find no abuse of discretion in the district court's determination that the offenses were properly joined under Rules 8 and 13. See Larkins , ¶ 68, 429 P.3d at 44 ("[B]ecause the charges ... involved the same victims, the same witnesses, and the same general accusations, they were well-suited for joinder.").
[¶19] Mr. Sparks contends that even if the offenses were properly joined under Rule 8 and 13 standards, the district court should have denied the joinder because it unfairly prejudiced him.[3] The determination of whether joinder will cause unfair prejudice requires a two-part analysis:
The first is whether the evidence relating to the similar offenses charged would be admissible in a separate trial of each offense. If the evidence would be admissible, there is no prejudice. If the evidence would not be admissible in separate trials, the trial court should then determine whether the evidence of each crime is simple and distinct. Stated differently, the second consideration is whether the evidence relating to the separate offenses would be so complicated that the jury could not reasonably be expected to separate them and evaluate the evidence properly and individually on each separate charge.
Hereford , ¶ 33, 342 P.3d at 1209 (quoting Lessard , ¶ 28, 158 P.3d at 705 ).
[¶20] In addressing the question of prejudice, the district court looked to whether evidence relating to the joined offenses would be admissible in separate trials on the offenses. The court observed:
And as I looked to Rule 404(b), it talks about other crimes, wrongs or acts. And the Court is not disturbed that the acts with respect to D.J.J. result in crimes charged occurred after the alleged crime with respect to A.K. I don't think there's a delimitation in Rule 404(b) on that front.
And the Court is of the view that if these were separately tried actions, that the activity alleged with respect to A.K. could indeed be admissible under Rule 404(b) in a trial of D.J.J., as tending to establish a modus operandi, course of conduct, plan, motive, opportunity, and intent, any number of those factors that are set forth in Rule 404(b).
[¶21] Mr. Sparks does not challenge the district court's determination that his acts with AK would be admissible in a trial on the offenses committed against DJJ, and indeed defense counsel conceded to their admissibility below. He asserts, however, that because the court did not address whether his acts with DJJ would likewise be admissible in a separate trial on the offenses committed against AK, it failed to fully analyze the joinder's potential for prejudice, and he contends that no such determination can be made at this late stage.
[¶22] Mr. Spark's argument is not entirely misplaced. The State argued below that Mr. Spark's acts of intercourse with DJJ would be admissible in a separate trial on the AK charges to prove the element of sexual gratification, but the district court did not address that aspect of the cross-admissibility question. This left a gap in the court's prejudice ruling that this Court may not fill on appeal. See Garrison v. State , 2018 WY 9, ¶ 20, 409 P.3d 1209, 1215 (Wyo. 2018) ; Griggs v. State , 2016 WY 16, ¶ 128, 367 P.3d 1108, 1143 (Wyo. 2016) (noting that Rule 404(b) determinations are not made in the first instance on appeal). This gap does not, however, require that we reverse the joinder ruling, because we may affirm the district court's judgment on any basis supported by the record. Allgier v. State , 2015 WY 137, ¶ 11, 358 P.3d 1271, 1275 (Wyo. 2015).
[¶23] Even if some evidence of Mr. Sparks' acts with DJJ might be ruled inadmissible in a separate trial on the AK charge, we find the second prong of our prejudice analysis to be easily satisfied. The facts of this case are simple and straightforward, and the jury could reasonably be expected to separately consider each charge and its supporting evidence. In Hereford , we observed:
Even if the district court might have ruled that some of the evidence was inadmissible *1104 in separate trials, the facts of this case, although horrifying, were fairly simple and straightforward. Moreover, the district court instructed the jury to evaluate each charge separately in concise and understandable language. The record contains nothing to suggest that the jury disregarded or failed to follow the instructions, or that it was unable for any reason to evaluate the evidence supporting the murder charge separately from that supporting the sexual assault and kidnapping charges. Indeed, the jury acquitted Appellant on one of the sexual assault charges, which strongly suggests that it held the State to its burden of proof, evaluated the evidence relating to each charge separately, and ultimately found the proof wanting in that respect. The district court did not abuse its discretion in refusing to sever the murder charge from the charges concerning B.B.
Hereford , ¶ 35, 342 P.3d at 1210.
[¶24] The same is true here. The jury was instructed to separately consider each charge and its supporting evidence, and nothing in the record suggests that it was unable to do so. As in Hereford , the jury acquitted Mr. Sparks on two of the charges against him, suggesting it was able to and did separately consider each charge. We are thus satisfied that under the second prong of our prejudice analysis the joinder of the AK and DJJ offenses did not prejudice Mr. Sparks.[4]
[¶25] The district court reasonably concluded that joinder of the sexual abuse charges was proper under Rules 8 and 13, and Mr. Sparks has failed to show that he was prejudiced by the joinder. We therefore find no abuse of discretion in the court's joinder of the offenses for trial.
II. Exclusion of Impeachment Evidence
[¶26] We next address Mr. Sparks' claim that the district court abused its discretion and violated his constitutional rights to confront witnesses against him and to present a complete defense when it excluded evidence of an alleged prior false accusation of sexual abuse by DJJ. We will begin by outlining the evidence excluded and the district court's reasons for its ruling and will then address Mr. Sparks' claimed errors.
[¶27] On March 19, 2015, DJJ's mother reported to the Gillette Police Department that she had discovered that DJJ was using her cell phone to have conversations with and send inappropriate photos to what appeared to be adult men. During discovery, Mr. Sparks' defense counsel obtained a copy of the police report that was generated as a result of that 2015 investigation. Contained within that report was a summary of some of the cell phone contents as described by the officer who searched the phone. The officer identified several recipients of messages from DJJ and paraphrased some of the messages including the following two entries:
Chester Copperpot ( [DJJ's] age was provided, during a conversation with Copperpot, [DJJ] claim[s] she has sex with her father ....)
* * * *
PerfectGentleman ( [DJJ's] age was provided, [DJJ] speaks of having sex with her father and becoming pregnant ....)
*1105 [¶28] In his motion for introduction of evidence relating to these statements in the police report, Mr. Sparks argued:
DJJ has made false allegations of sexual abuse before to garner attention. She told people online that her father sexually abused her. It is the Defense's assertion that this evidence is pertinent and provides motivation and the intent in the defense's allegation that DJJ's allegations against the Defendant are false and were made in an attempt to garner attention.
[¶29] During the in-chambers hearing on Mr. Spark's motion, DJJ testified that she did not recall telling anyone in her online communications that her father abused her.
Q. And you've had conversations with a number of men on various hookup sites, didn't you?
A. Yes.
Q. Did you ever tell anyone on those sites that you had sex with your father and became pregnant?
A. No.
Q. Never?
A. Not that I can recall.
Q. Did you ever tell anybody that?
A. No.
Q. Did you have sex with your father?
A. No.
[¶30] In response to defense counsel's questions drawn from the police report describing the contents of her phone, DJJ testified:
Q. This is the download from your phone.
A. Okay.
Q. This is what the Police Department found on your phone
A. Okay.
Q. And you had a conversation with a fellow named Copper Pot.
A. Okay.
Q. Okay? Did you lie to Copper Pot?
A. Yes.
Q. You lied to Copper Pot?
A. Yes.
[¶31] In response to questions from the prosecutor, DJJ testified:
Q. Okay. Do you recall talking to a lot of people on various apps?
A. Yes.
Q. Do you remember every specific conversation that you had?
A. No.
Q. Okay. Do you have an independent recollection? That means do you remember telling anybody about having sex with your dad?
A. No.
[¶32] After hearing the parties' arguments and DJJ's testimony, the district court announced its ruling denying Mr. Spark's motion to introduce evidence of DJJ's online statements.
So here's how the Court sees this. For purposes of this particular hearing in ruling on this, the Court's going to conclude, and I'm relying mainly on the offer of proof submitted by the defense, page 5 of 7 of Officer Stroup's report, the Court's going to conclude that two statements were made to the effect at issue here.
* * * *
So for purposes of this hearing, the Court's going to find that [DJJ] claimed to have had sex with her father in one instance and claimed to have had sex with her father and had become pregnant by him in another instance in an anonymous communication, i.e., not with her true identifiable name or identity[,] to individuals who use a handle, not their true identity[,] on the Internet in hookup apps for these sexual venues. So the young lady made the statement.
* * * *
And the argument here for admission here is that this was an example of her making a false statement to garner attention. And to the Court that's an important argument, to garner attention, and saying Judge, that's what she's doing here. Ladies and gentlemen of the jury, that's what she's doing here, she's making a completely false accusation against this defendant as a means of garnering attention from the authorities, I suppose.
Well, what attention did she garner here? From looking at this report, none. I *1106 don't see anybody sending return messages: Oh, you poor girl, this, that and the other thing. In fact, probably I'm guessing men who receive messages like this probably think Boy, she's really vulnerable, now I can really take advantage. So I'm not sure she received any attention, it would just mean that she attempted to garner it. I'm just saying that there appears to be probably nothing reciprocal in terms of attention coming her way.
But suffice that to say with all of that predicate, the Court does find that the statements are relevant. Now, how relevant? The Court's of the view that the relevance is of half measure. And the reason I say that is going back to this set and setting of these declarations. I'm not sure I can really put my finger on it, but to me it's a lot different for somebody to make declarations of this kind, a girl of 14, 15 years of age, when she's not identified, making statements to the Internet universe to people who are not identified. That's different from this young lady walking down the street, tugging on the shirt sleeve of somebody of consequence in her life, and falsely stating "dad had sex with me and I became pregnant by him." And that's why I say this material, while relevant, is only relevant to a half measure.
I think the set and setting of these declarations on the Internet on these anonymous sex apps or hookup apps renders this material, the relevancy of this material quite attenuated, although to an extent it is relevant.
We then turn to Rule 403, and the Rape Shield law requires the Court to determine whether or not the probative value of the evidence substantially outweighs the probability that its admission will create prejudice.
And I think the Court has to take into account the other factors under Rule 403, which include confusion of the issues, misleading the jury, considerations of undue delay, waste of time, this kind of thing. And the Court is of the view that the probative value of this evidence, diluted as it is for the reasons I've just explicated, is substantially outweighed by its prejudicial effect, and outweighed by its likelihood for distracting the jury, confusing the issues at hand, misleading the jury.
And the Court takes into account and is persuaded by the argument of the State's attorney under Budig , which discusses the reasoning behind the Rape Shield law. And the Rape Shield law I think is intended to, and I think they said this in Budig , to encourage, not discourage, I should say, people from reporting instances of sexual assault. And this is all enacted for the benefit of an alleged victim, not for the benefit of a defendant.
And so the Court's of the view that this is marginal evidence, would lead to confusion of the issues, does not bear the hallmarks of evidence that would survive a Rape Shield review at all, and so the Court is going to deny inquiry on this piece of evidence.
[¶33] Against that backdrop, we consider Mr. Sparks claims that: 1) the district court abused its discretion under Rule 403 and the rape shield statute; 2) the court's ruling violated his constitutional right of confrontation; and 3) the court's ruling violated his constitutional right to present a complete defense.
A. Abuse of Discretion Claims
[¶34] We review a district court's ruling on the admissibility of evidence for an abuse of discretion. Farrow v. State , 2019 WY 30, ¶ 52, 437 P.3d 809, 823 (Wyo. 2019). "We afford considerable deference to a trial court's rulings on the admissibility of evidence, and we will not disturb the trial court's ruling if there is a legitimate basis for it." Id ."Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." Moser v. State , 2018 WY 12, ¶ 40, 409 P.3d 1236, 1248 (Wyo. 2018) (quoting Triplett v. State , 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017) ).
[¶35] We begin with the district court's *1107 Rule 403 analysis.[5] The court found that DJJ's statements that she had sex with her father and became pregnant had limited probative value because of their context, and whatever probative value they had was outweighed by their potential for unfair prejudice. We find nothing unreasonable in this conclusion.
[¶36] The statements DJJ made about her father were not reports of sexual abuse. They were statements made anonymously to an anonymous person and therefore could result in no consequences to her or her father. The anonymous nature of the communication gave DJJ license to say anything she wanted without concern for follow-up. In contrast, although DJJ did discuss her sexual contact with Mr. Sparks with friends at camp and with the camp counselor, the report she made was to her mother and law enforcement. That was plainly not an anonymous statement from which no consequences would flow. The district court concluded that because the circumstances and consequences were so different, the probative value of DJJ's internet declarations was limited. This conclusion is neither unreasonable nor arbitrary and capricious.
[¶37] We likewise find nothing unreasonable in the district court's view that the potential for the evidence to distract and mislead the jury and confuse the issues outweighed its limited probative value. DJJ had no recollection of making the online statements concerning her father, so the only way that evidence could come in would be through the police report, assuming its admissibility. If the police report could have been admitted, it would require testimony as to the circumstances of the report DJJ's mother made to law enforcement and the nature of the anonymous communications, which would in turn require delving into DJJ's online sexual activities. To admit the evidence without that context would leave the jury confused and potentially misled as to the nature of both the statements and the police report. Given the marginal relevance of the evidence, we can find no abuse of discretion in the district court's decision to avoid the potential prejudice and confusion.
[¶38] It is for this reason that we also agree with the district court that the evidence implicated the rape shield statute.[6] Unless the evidence were admitted in a way that was confusing and potentially misleading, it would require testimony concerning DJJ's use of hook-up apps and her online activities of a sexual nature, in other words her prior sexual conduct. Although the rape shield statute is not an absolute bar to the admissibility of this type of evidence, "only in the unusual case will the probative value of *1108 this kind of evidence substantially outweigh its highly probable prejudicial effect on the victim and the public policy underlying the statute's enactment." Moser , ¶ 42, 409 P.3d at 1249 (quoting McGarvey v. State , 2014 WY 66, ¶ 18, 325 P.3d 450, 456 (Wyo. 2014) ). Given that the evidence's probative value was outweighed by its potential for prejudice, as discussed above, we find no abuse of discretion in the district court's conclusion that the evidence was not admissible under the rape shield statute.[7]
B. Constitutional Claims
[¶39] We next address Mr. Sparks' claims that the exclusion of DJJ's prior false statement concerning her father violated his constitutional rights to confrontation and to present a complete defense. Mr. Sparks did not raise either claim below, and we therefore review both claims for plain error. Anderson v. State , 2014 WY 13, ¶ 20, 317 P.3d 1108, 1115 (Wyo. 2014) (review of constitutional claims is for plain error where appropriate objection not made below). Under our plain error review, the defendant must establish: 1) the record clearly shows the incident alleged as error; 2) the district court transgressed a clear and unequivocal rule of law; and 3) the defendant was denied a substantial right resulting in material prejudice. Bazzle v. State , 2019 WY 18, ¶ 28, 434 P.3d 1090, 1097 (Wyo. 2019) (citing Johns v. State , 2018 WY 16, ¶ 12, 409 P.3d 1260, 1264 (Wyo. 2018) ).
1. Confrontation Claim
[¶40] The district court denied Mr. Sparks the opportunity to confront DJJ with her prior statements alleging sexual abuse by her father, and the record thus clearly shows the incident Mr. Sparks alleges as error. Mr. Sparks has not, however, established that the district court's ruling transgressed a clear and unequivocal rule of law.
[¶41] The constitutional right to confront a witness arises under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Wyoming Constitution. We have summarized that right and the limitations a court may constitutionally place upon it as follows:
The primary right secured by the Confrontation Clause of the United States and Wyoming Constitutions is the right of cross-examination. In order for there to be a violation of the right of confrontation, a defendant must show more than just a denial of the ability to ask specific questions of a particular witness. Rather, a defendant must show that he was prohibited "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " Hannon [v. State, 2004 WY 8,] ¶ 18, 84 P.3d [320] at 330 [ (Wyo. 2004) ] (quoting Delaware v. Van Arsdall , 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) ). The Confrontation Clause guarantees a defendant an "opportunity for effective cross-examination, not cross-examination that is effective in whatever *1109 way, and to whatever extent, the defense might wish." Van Arsdall , 475 U.S. at 679, 106 S.Ct. at 1435 (quoting Delaware v. Fensterer , 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam ) (emphasis in original)). A defendant's right to cross-examination of a witness is not unfettered, but is subject to the trial court's "discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance." Hannon , ¶ 22, 84 P.3d at 331-32 (quoting United States v. DeSoto , 950 F.2d 626, 629-30 (10th Cir. 1991) ); see also Olden v. Kentucky , 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (per curiam ).
Swan v. State , 2014 WY 38, ¶ 10, 320 P.3d 235, 238 (Wyo. 2014) (quoting Budig v. State , 2010 WY 1, ¶ 8, 222 P.3d 148, 151 (Wyo. 2010) ).
[¶42] Mr. Sparks presumably sought to cross-examine DJJ using the police report that summarized her online activities and statements. The district court exercised its discretion to prevent that questioning because the evidence was of marginal relevance and that that relevance was outweighed by the potential for prejudice. Mr. Sparks was not otherwise restricted in his ability to challenge DJJ's credibility and motives, and his counsel was permitted to elicit testimony from DJJ and her mother that DJJ has been dishonest, and from DJJ that she does not like Mr. Sparks being in her stepsister Mikelah's life. Under like circumstances, where evidence was held inadmissible under the rape shield statute, we have found no violation of a defendant's confrontation rights.
We hold that because the evidence of meanness, manipulation, and prior sexual conduct was not admissible, and because the appellant was given the opportunity to challenge the victims' credibility, motives, and biases using other admissible evidence, the appellant was not denied his constitutionally protected right to confrontation.
Budig , ¶ 14, 222 P.3d at 154.
[¶43] Because Mr. Sparks has failed to establish a violation of a clear and unequivocal rule of law, we need not complete the prejudice prong of plain error analysis. We find no plain error as to Mr. Sparks' confrontation rights.
2. Right to a Complete Defense
[¶44] Mr. Sparks contends that the district court's exclusion of DJJ's false statement concerning her father violated his right to present a complete defense. While the record clearly shows the incident Mr. Sparks alleges as error, we again find that he has failed to establish a violation of a clear and unequivocal rule of law.
[¶45] We have described the right to present a complete defense and the limitations on that right as follows:
The United States Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Crane v. Kentucky , 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) ; Hannon , ¶ 62, 84 P.3d at 346. "[T]he Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." Holmes [v. South Carolina ], 547 U.S. [319] at 327, 126 S.Ct. 1727 [164 L.Ed.2d 503] [ (2006) ]. However, the Constitution does not prevent trial judges from applying well-established rules of evidence to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Id . The Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice or confusion of the issues. Id ."A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." Id .
Smith v. State , 2009 WY 2, ¶ 37, 199 P.3d 1052, 1064 (Wyo. 2009) (quoting Bush v. State , 2008 WY 108, ¶ 59, 193 P.3d 203, 217-18 (Wyo. 2008) ).
[¶46] Here again, the district court excluded DJJ's prior statements based on its findings that the evidence was only marginally *1110 relevant and that its probative value was outweighed by its potential for prejudice. We have upheld that determination, and Mr. Sparks therefore cannot show a violation of his right to present a complete defense.
CONCLUSION
[¶47] We find no abuse of discretion in the district court's joinder of the sexual abuse charges relating to the two victims. We also find no abuse of discretion and no constitutional violation in the court's exclusion of evidence of a prior false statement of sexual abuse by one of the victims. Affirmed.

We will discuss the proffered evidence and the district court's reasoning in greater detail in our review of the court's ruling.

Mr. Sparks did not challenge the joinder of the counts charging the contributing of alcohol to DJJ and AK, so the district court's sole concern was with the sexual assault charges.

Rule 14 provides that "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses ..., the court may order an election or separate trials of counts[.]" W.R.Cr.P. 14.

Mr. Sparks contends that because the testimony of DJJ's mother was the only foundationally sound evidence of the date of the crime against AK, and the district court did not determine the admissibility of that evidence in a separate trial on the AK offense, there was an inappropriate commingling of the evidence on the charges in contravention of the second prong of the prejudice analysis. This argument is misplaced. First, Mr. Sparks did not object to the admissibility of DJJ's mother's testimony to establish the date of the offense against AK, and Mr. Sparks offers no basis for its exclusion in a separate trial. Additionally, the second prong of the prejudice analysis requires that a jury be reasonably able to separately consider each charge and the evidence supporting that charge. It does not bar the use of the same evidence in proving each offense. Indeed, use of the same evidence is one of the reasons our rules favor joinder. Earley v. State , 2011 WY 164, ¶ 5, 267 P.3d 561, 563 (Wyo. 2011) ; see also Hereford , ¶ 31, 342 P.3d at 1209 ("Joinder of offenses is proper absent compelling reasons for severance, because joint trials serve the public interest in expediting the administration of justice by reducing docket congestion, conserving the time of judges and juries, and avoiding the need to recall witnesses to provide identical or overlapping testimony .") (emphasis added).

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."W.R.E. 403.

The rape shield statute restricts the admissibility of evidence of a victim's prior sexual conduct. It provides:
(a) In any prosecution under this article or for any lesser included offense, if evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim is to be offered the following procedure shall be used:
(i) A written motion shall be made by the defendant to the court at least ten (10) days prior to the trial stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the victim and its relevancy to the defense;
(ii) The written motion shall be accompanied by affidavits in which the offer of proof is stated;
(iii) If the court finds the offer of proof sufficient, the court shall order a hearing in chambers, and at the hearing allow the questioning of the victim regarding the offer of proof made by the defendant and other pertinent evidence;
(iv) At the conclusion of the hearing, if the court finds that the probative value of the evidence substantially outweighs the probability that its admission will create prejudice, the evidence shall be admissible pursuant to this section. The court may make an order stating what evidence may be introduced by the defendant, which order may include the nature of the questions to be permitted.
(b) This section does not limit the introduction of evidence as to prior sexual conduct of the victim with the actor.
(c) Any motion or affidavit submitted pursuant to this section is privileged information and shall not be released or made available for public use or scrutiny in any manner, including posttrial proceedings.
Wyo. Stat. Ann. § 6-2-312 (LexisNexis 2017).

That is not to say that we agree with the State's assertion that the rape shield statute applies to any prior report of sexual assault whether true or false. We have described the policy behind the rape shield statute as follows:
Wyoming, along with most other jurisdictions, enacted a "rape-shield" statute to bring under control a long-standing tradition that rape victims could be discredited as witnesses based on prior sexual conduct.... This tradition was based on the faulty notion that women who engaged in nonmarital intercourse were immoral and likely to engage in such conduct on any given occasion, and was deemed prejudicial and humiliating to the victim. Annotation, Constitutionality of "Rape Shield" Statute Restricting Use of Evidence of Victim's Sexual Experiences , 1 A.L.R.4th 283, 286 (1980).
Moser , ¶ 42, 409 P.3d at 1249 (quoting Carroll v. State , 2015 WY 87, ¶ 21, 352 P.3d 251, 257 (Wyo. 2015) ).
The difficulty in the present case is that admission of DJJ's prior statements would have required testimony concerning her prior sexual conduct and, with the evidence's potential for prejudice outweighing its probative value, it would have run afoul of the policy underlying the statute. On the other hand, if the evidence of a false report does not implicate past sexual conduct, it may be that admissibility of the evidence would be properly analyzed under Rule 403 rather than the rape shield statute.