# IN THE SUPREME COURT, STATE OF WYOMING

# 2020 WY 76

APRIL TERM, A.D. 2020

June 15, 2020

GEORGE EVERETTE TAMBLYN,

Appellant
(Defendant),

v.

S-19-0212

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
The Honorable Kerri M. Johnson, Judge

*Representing Appellant:*
Office of the State Public Defender:  Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    The district court found George Everette Tamblyn guilty of second-degree sexual abuse of a minor, third-degree sexual abuse of a minor, and incest.  Mr. Tamblyn argues the victim, his five-year-old daughter M.B. (six years old at the time of trial), was not competent to testify as a witness.  He further asserts that due to her incompetency, as well as her behavior and refusal to answer questions at trial, he was denied his right to confront a witness against him in violation of the Confrontation Clause of the Sixth Amendment and Article 1, § 10 of the Wyoming Constitution.  We affirm.

## ISSUES

[¶2]    Mr. Tamblyn raises one issue, which we separate into two:

1.  Did the district court abuse its discretion in finding the victim competent to testify as a witness?

2.  Was Mr. Tamblyn denied his right to confront a witness against him in violation of the Sixth Amendment of the United States Constitution and Article 1, § 10 of the Wyoming Constitution?

## FACTS

[¶3]    M.B. is the biological daughter of Mr. Tamblyn and Ella Baldwin.  In February 2017, Ms. Baldwin was charged with child endangerment based on her use of methamphetamine.  As a result, the Department of Family Services (DFS) took M.B. into protective custody.  In January 2018, M.B. was living with her foster mother but was having unsupervised overnight visits with each of her parents.

[¶4]    On January 10, 2018, M.B. told Ms. Baldwin that Mr. Tamblyn had "pulled his privates out of his pocket and showed it to her."  The incident occurred on January 7, 2018, while M.B. was having an overnight visit at Mr. Tamblyn's house.  Later that night, M.B. told her foster mother that Mr. Tamblyn had "made her touch his pee-pee."  M.B.'s allegations were reported to DFS, which in turn reported them to the Natrona County Sheriff's office.

[¶5]    The next day, January 11, 2018, Baleigh Hite conducted a forensic interview of M.B. at the Child Advocacy Project (CAP) center.  The interview was videotaped.  M.B. informed Ms. Hite that Mr. Tamblyn had showed her his "pee-pee" and told her she had to "suck it."  When he said that, M.B. "did nothin" but did touch his "pee-pee" with her hand.  When Ms. Hite asked M.B. what Mr. Tamblyn's "pee-pee" looked like, M.B. said it was "disgusting."  She also said it felt "hot."  Ms. Hite asked M.B. to draw a picture of Mr.

1

Tamblyn's "pee-pee." M.B. drew an object resembling a penis and colored it red because, according to M.B., red means "super hot."

[¶6]   M.B. told her counselor, Lauren Jackson, that Mr. Tamblyn showed her his private parts and she touched them. She also disclosed that (1) she showed Mr. Tamblyn her private parts, he liked it, and he kissed them; (2) Mr. Tamblyn "peed all over her hands" and it was "sticky and yellow and orange in color"; (3) Mr. Tamblyn asked her "to suck his privates," showed her how to do so by showing her "pictures on his phone of a little girl sucking privates," and M.B. sucked Mr. Tamblyn's penis; and (4) Mr. Tamblyn took a blue kitchen spoon and "put[] it down her butt." M.B. reported the abuse occurred in Mr. Tamblyn's living room and drew pictures of "her dad sitting in a recliner [with] his privates in his pocket being pulled out and [her] standing there" and her "sucking his penis." When Ms. Jackson showed M.B. a diagram of a male body and circled the penis, M.B. exclaimed, "that's yucky." When asked what she meant, M.B. responded, "daddy showed me that." M.B. told Ms. Jackson that Mr. Tamblyn's penis "felt hard, like his bone was coming out of his pee-pee" and his pubic hair was "brown like his hair." She also said she loved and missed her daddy and wished he would stop showing her his "damn privates" so she could be with him again.

[¶7]   Natrona County Sheriff Officer Taylor Courtney interviewed Mr. Tamblyn on January 12, 2018. This interview was also videotaped. Mr. Tamblyn initially claimed his penis could have been "hanging out" of the fly of his pajama pants on the morning of January 7, while M.B. was having an overnight visit at his house. However, after being confronted with M.B.'s disclosures, including her description of his penis, Mr. Tamblyn eventually admitted M.B. had touched his penis twice while she was re-adjusting her position on his lap. He said the first time she touched his penis she did so over his clothing; the second time, however, she touched his bare penis. He initially claimed he did not have an erection at the time but later admitted it was possible he had a partial erection.

[¶8]   Mr. Tamblyn was charged with one count of first-degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-314 (LexisNexis 2019) based on Mr. Tamblyn having placed his penis in M.B.'s mouth (Count 1); two counts of second-degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-315 (LexisNexis 2019) based on M.B. touching Mr. Tamblyn's penis with her hand and Mr. Tamblyn touching her genitals (Counts 2 and 3, respectively); one count of third-degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-316 (LexisNexis 2019) based on Mr. Tamblyn having taken immodest, immoral or indecent liberties with M.B. (Count 4), and one count of incest in violation of Wyo. Stat. Ann. § 6-4-402 (LexisNexis 2019) (Count 5). Prior to trial, Mr. Tamblyn requested a hearing to determine whether M.B. was competent to testify. The district court held a hearing and found M.B. competent.

[¶9]    Mr. Tamblyn waived his right to a jury trial.  At the bench trial, M.B. did not testify that she touched Mr. Tamblyn's penis, only that he showed it to her.  However, Ms. Baldwin, M.B.'s foster mother, Ms. Hite and Ms. Jackson testified to what M.B. had reported to them, including that Mr. Tamblyn had shown M.B. his penis and she had touched it.  Officer Courtney relayed Mr. Tamblyn's admission that M.B. had touched his penis twice.  Mr. Tamblyn's probation officer recounted her conversations with him in late January in which he said M.B. touched his penis with her foot and he would sometimes get a "tickle or start[] getting an erection" when M.B. would sit on his lap and wiggle around.  Portions of the videos of the CAP interview and Officer Courtney's interview with Mr. Tamblyn were played for the court.

[¶10]  S.H., Mr. Tamblyn's niece, testified he inserted his fingers into her vagina and "fingered her" on two different occasions in 2002, when she was 8-9 years old.  After the first incident, he told her that if she used lotion , next time it would not hurt.  S.H. reported the abuse in 2011.  Casper Police Officer Joey Wilhelm testified he interviewed Mr. Tamblyn in 2011 and Mr. Tamblyn admitted during that interview that he rubbed S.H.'s vagina once and inserted his finger into her vagina twice.  This interview was recorded and played for the court at trial.[1]

[¶11]  At the close of the State's evidence, Mr. Tamblyn moved for a directed verdict on all counts.  The State conceded there was no evidence other than M.B.'s counseling records supporting Counts 1 and 3 (Mr. Tamblyn placing his penis in M.B.'s mouth and touching her genitals, respectively), and those counts should be dismissed.  The district court agreed and dismissed those counts but denied Mr. Tamblyn's motion as to the remaining counts.  At the close of the evidence, the court found Mr. Tamblyn guilty of Counts 2, 4 and 5.  Because Mr. Tamblyn had previously pled no contest to second-degree sexual assault of a minor based on his abuse of S.H., the district court sentenced him to a mandatory sentence of life imprisonment without the possibility of parole on Count 2.  *See* Wyo. Stat. Ann. § 6-2-306(e).  The district court also sentenced him to 10-15 years imprisonment on each of Counts 4 and 5.  All sentences were ordered to run concurrent to each other.  Mr. Tamblyn timely appealed.

## STANDARD OF REVIEW

[¶12]  We review a district court's competency determination for an abuse of discretion.  *Young v. State*, 2018 WY 53, ¶ 14, 418 P.3d 224, 227 (Wyo. 2018).  "Determining whether the trial court abused its discretion involves consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner."  *Id.* (quotations omitted).  With respect to child witness competency determinations,

---

[1] S.H. and Officer Wilhelm's testimony was admitted pursuant to Wyoming Rule of Evidence 404(b) to show motive, intent, and absence of mistake.  Mr. Tamblyn does not challenge the admission of this testimony on appeal.

3

> "[w]e do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness' facial expressions, inflections in her voice and watches her mannerisms during examination. These observations are a vital part of the ultimate ruling on competency."

*Id.*, ¶ 14, 418 P.3d at 227-28 (quoting *Gruwell v. State*, 2011 WY 67, ¶ 25, 254 P.3d 223, 231 (Wyo. 2011) and *Seward v. State*, 2003 WY 116, ¶ 32, 76 P.3d 805, 819 (Wyo. 2003)).

[¶13]  Mr. Tamblyn's Confrontation Clause argument is a question of law reviewed de novo. *Schmidt v. State*, 2017 WY 101, ¶ 22, 401 P.3d 868, 878 (Wyo. 2017) (citing *Bruce v. State*, 2015 WY 46, ¶ 19, 346 P.3d 909, 916 (Wyo. 2015)).  *See also, Bush v. State*, 2008 WY 108, ¶ 48, 193 P.3d 203, 214 (Wyo. 2008) ("Issues arising under the constitution are questions of law which we review *de novo*.") (citing *Hannon v. State*, 2004 WY 8, ¶ 11, 84 P.3d 320, 328 (Wyo. 2004)).

## DISCUSSION

[¶14]  Mr. Tamblyn argues the district court abused its discretion in finding M.B. competent to testify.  He also contends that due to her incompetency, as well as her behavior and refusal to answer questions at trial, he was denied his right to confront her as a witness.  Because both arguments are based on M.B.'s testimony at the competency hearing and bench trial, we recount that testimony prior to addressing the issues, with particular emphasis on her testimony and behavior at trial.

### *M.B.'s Testimony at the Competency Hearing*

[¶15]  At the start of the competency hearing, the district court asked M.B. her name.  She did not immediately respond and hid under the witness table.  The court asked M.B. to sit in the chair, which she did.  M.B. eventually told the court her name,[2] her age, her birthdate, and that she was in kindergarten.  When the court asked her where she went to school, M.B. responded, "Lincoln Kindergarten," then "Lincoln High School," and told the court she was in fourth grade, then second grade.  M.B. named her teacher and told the court she "play[s]" and does "everything that's fun" at school.  She said she could count to 100 and recited her ABCs for the court.  M.B. said she had a little brother, a "mean sister" who "lies," and provided their names.  She said her mother would have to tell the court where she lived because "I never know where I live."  She said she had lived with her mother for "[a] hundred years."  M.B. provided the court her mother and father's names ("Ella

---

[2] M.B. was referred to by her nickname throughout the competency hearing and bench trial.  We will refer to her as M.B.

Baldwin" and "George"). She stated her mother was in the courtroom but her father was not there as "[t]he guy" in the orange clothes was "not actually [her] dad" because "her daddy does not have orange clothes."

[¶16] When asked if she knew what a lie and the truth are, M.B. said yes and provided examples of each. M.B. also provided the court with both a truth and a lie about the colors of the courtroom. She told the court it was not right to lie and if one lies, "You get in trouble. If you're a grownup and say a lie, . . . you go in jail" and if she lies, she "get[s] in trouble by . . . [her] teacher or . . . mommy . . . [o]r . . . aunt or . . . uncles." The court told M.B. "we always have to tell the truth in court" and asked her, "Do you promise if you're sitting in that chair, that you'll tell the truth?" M.B. replied, "Yep." M.B. then explained she had seen a person raise his hand in a movie and tell a lie and that "wasn't right." M.B. stated if she had to raise her hand and promise to tell the truth, she would. She also said, "If you lie, that's wrong. If you tell the truth, . . . that's right."

[¶17] M.B. told the court her "daddy's house" is "far away in the mountains" and she was there "[a] long, long time ago when [she] was 3." Later, she said she lived with her father when she was 5. When she was at his house, she played video games, blocks, Paw Patrol, and tag and had her own "pretty" bedroom which was "[r]ainbow" colored. She described the rooms in the house and named the types of furniture in the living room. She said "Whitley" also lived there; she described Whitley as "[her] dad's boyfriend." She also told the court what presents she received for her last birthday, the names of her friends, and that she went to preschool prior to kindergarten.

[¶18] At the conclusion of questioning, the court asked M.B., "Is there anything else you want to tell me?" M.B. replied, "Yeah. It's about my daddy. My daddy showed me his private parts because he put it out of his pocket. He told me to suck it. And he got in jail, but I actually think he's actually not here yet. I think he's not actually coming here."

[¶19] The district court acknowledged M.B. had provided "some problematic answers" and had a "nervous energy" but decided she was competent to testify. It concluded each of the factors we identified in *Larsen v. State*, 686 P.2d 583, 585 (Wyo. 1984), was satisfied: (1) M.B. understood the obligation to speak the truth on the witness stand because she indicated she knew the difference between the truth and a lie, gave examples of each, stated it was wrong to lie, described the consequences of lying, and promised to tell the truth; (2) she had the mental capacity at the time of the occurrence to receive an accurate impression of it as she testified to the time she stayed with her father, described his house and the living room where the sexual abuse allegedly occurred, recalled there being a chair in the living room and games at his house, and recalled being in preschool prior to kindergarten; (3) she had a memory sufficient to retain an independent recollection of the occurrence as evidenced by her spontaneous recount of the allegations; (4) she had the capacity to express in words her memory of the occurrence; and (5) she was able to understand and answer questions.

5

*M.B's Testimony at Trial*

[¶20]  The district court asked M.B. to raise her right hand and administered the oath to her.  In response, M.B. stated, "I don't want to.  I want to play with the --."  The court asked her again if she promised to tell the truth  and prompted her to answer the question "yes" or "no"; this time, M.B. responded, "Yes."

[¶21]  During direct examination, M.B. provided her name, said she lived with "Ella Baldwin" and told the court she was "[s]ix."  She testified she did not have any brothers, sisters or pets and liked to "[c]olor and play."  She reported she was in school at "Lincoln Elementary" and she liked school but did not know what she liked best about it.  She said she did not know what she was there to talk about.  The prosecutor asked her if she "[has] visits with [her] dad right now."  M.B. initially responded, "[y]eah," but then clarified that the last time she visited her dad was "[a] long, long time ago."  When asked if she knew why she could not see her dad right now, she responded, "[b]ecause he showed me his private parts."  The prosecutor asked what "people do with the private part;" M.B. replied, "He pulled it out of his pocket because he had a hole in his pocket."  The prosecutor asked M.B. whether the private part is "the part people go to the bathroom with"; she said, "Yep."  The prosecutor asked her what her dad said when "he pulled it out of his pocket."  M.B. responded, "He showed me pictures and he showed me -- and he told me to suck it." [Id.].  When asked what she did when he told her that, M.B. said, "I did nothing.  I just stared at him, like, are you even kidding me."  M.B. told the prosecutor it happened "[i]n my daddy's house" and "Whitley and [her] baby sister" also live there.  When asked if she remembered talking with "a lady named Baleigh and telling her that you touched it," M.B. shook her head no.  The prosecutor had no further questions.

[¶22]  As defense counsel began cross-examination, M.B. said, "I want my daddy."  Because M.B. was "obviously upset" and needed "a chance to recover," defense counsel requested a recess; the district court took a 15-minute break.  After the break, the district court stated M.B. could come forward.  M.B. responded, "Daddy, daddy."  After the court confirmed M.B. still promised to tell the truth, the following exchange occurred between defense counsel and M.B., while M.B. was playing with a stuffed animal:

> Q.  Hello, [M.B].  Hi.  Remember who I am?  Did [the prosecutor] just introduce me to you?  Is that a monkey or a dog?
> A.  Dog.  Yip yip.
> Q.  Dog.  The dog goes yip yip?
> A.  (Making dog sounds.)
> Q.  [M.B.], do you have a favorite color?
> A.  Huh-uh.
> Q.  No?  Not a favorite color at all?

A. Huh-uh.

Q. Okay. Where do you live?

A. (Making dog sounds.) CY -- CY Apartments, my dog says.

Q. What did your dog say?

A. CY apartments, my dog said.

. . . .

Q. And who do you live with?

A. (Making dog sounds.) My dog said Ella Baldwin.

Q. Who is Ella Baldwin?

A. (Making dog sounds.) My dog said my mom.

Q. Oh, okay.

A. It's not my name, but my dog said it -- my mom, but it's not my dog's mom.

Q. Oh. Does your dog have a mom?

A. Yeah. You want to know who?

Q. Yes.

A. (Making dog sounds.) My dog said me.

Q. You're your dog's mom?

A. Uh-huh.

Q. Are you a good mom?

A. Yeah, and I miss my daddy and I wanted to give him hugs.

Q. Okay. I understand that. [M.B.], did someone tell you that you should say you live with Ella Baldwin?

A. (Nodding head.)

Q. Who told you that?

A. (Raising dog up.)

Q. Your dog told you that you should say you live with Ella Baldwin?

A. (Nodding head.)

Q. Did somebody tell you that while you were getting ready for speaking here today?

A. (Raising dog up.)

Q. Your dog. Ah. [M.B.], do you need to take another break? Are you trying to take your necklace off?

A. I'm trying to make it easier so my daddy can remember I'm his kid.

Q. Are you afraid he's forgotten that?

A. Because I have earrings and a necklace on.

Q. How will that make a difference, [M.B.]?

With M.B.'s permission, defense counsel removed her necklace. Once he did so, M.B. went under the witness table.

[¶23]   Because M.B. "obviously [did] not want to sit in the chair," the court took a break and had the State call its next witness. After the witness's testimony and a lunch break, M.B. returned to the stand. Defense counsel proceeded to ask M.B. a series of questions about where she lived. M.B. said she had "just lived in two places"—"[t]he CY apartments [and] somebody's house that's named Richard"—and explained she and her mother moved to an apartment "because [Richard] was being mean" as he would not share his eggs with her. She said she was staying at the CY Apartments until "my mommy gets money to move." Defense counsel asked her if there was someplace she would want to move; M.B. responded, "I want to live into a rainbow house." When asked "Where is that?," M.B. said, "I have no clue." Defense counsel then asked her, "What's the rainbow house like?" M.B. responded, "[I]t's just the CY Apartments. I just wanted to move into a rainbow house. I just want it to be white so I can color -- so I can paint it all . . . rainbow."

[¶24]   Defense counsel asked M.B. if she went to "Lincoln school" and the name of her teacher. M.B. responded she went to "Lincoln Elementary School[:] Kindergarten" and named her teacher. When asked whether she knew what the words "real" and "imaginary" mean, M.B. replied no. However, she knew what "true" meant and "what it means if something is not true" and gave examples of each, similar to those she provided at the competency hearing. She then said, "Bye-bye. See you later." Defense counsel then asked whether she ever stayed with her dad or went to his house. She initially said "[n]o" but then said, "I just miss Whitley and my baby sister and my daddy. I just miss living with him." She then told defense counsel she lived with her dad in the past and had her own room at his house, which "was white with -- I don't -- can't remember."

[¶25]   Defense counsel asked M.B. if she had told a lot of people that she misses her dad. M.B. responded, "I only told my mommy." When asked what her mommy says when she says she misses her dad, M.B. replied, "[M]y mommy say you gotta deal with it because . . . he didn't do the right thing." M.B. clarified that her mother does not say what her dad did wrong and, when asked how often her mother says her dad did not do the right thing, M.B. responded, "I have no clue." Defense counsel asked M.B. why she could not live with her dad. M.B. responded, "Because he did something wrong." When asked if she had "talked to somebody about what he did" or with anyone prior to testifying, she said, "I only talked with my mommy." Defense counsel asked if she recalled when she first told her mother about what her dad had done; M.B. responded, "Yeah. Every day when I go to bed, I say, mommy, I miss my daddy." When asked "what does [your mommy] say when you say that," M.B. said, "I have no clue."

[¶26]   Defense counsel asked M.B. whether her mother had told her to say she lived with "Ella Baldwin." M.B. replied, "It's only my puppy that said that." At this point, M.B. again retreated under the witness stand. After some prodding, M.B. returned to the chair.

Defense counsel then asked if she knew "Lauren Jackson" and if she recalled "talking to a lady named Baleigh." M.B. responded no to each inquiry. When asked what she did at her dad's house, M.B. replied, "Play." M.B. explained she played "bunnies in a cave" and then corrected herself, saying it was cats, not bunnies, and she "just pretended under [her] bed was their cave." She then volunteered that she missed that bed and still has the sheets and blankets. She told defense counsel she did not remember the last time she was at her dad's house but did remember him showing her pictures on his phone "[a] long time ago." She had "no clue" what kind of pictures.

[¶27] Defense counsel asked M.B. to identify a person in the courtroom. M.B. identified her "counselor, Miss Lauren." When asked whether her counselor had asked her about missing her daddy, M.B. did not initially respond. After the question was repeated, M.B. replied, "I have no clue." M.B. reiterated she had "only talked" with her mother about testifying. Defense counsel then asked her whether she had ever talked to "Mr. Taheri" or "Kevin" (the prosecutor) and whether she knew "Taylor" (presumably Officer Courtney). M.B. responded "I have no clue" to each question.

[¶28] Defense counsel again asked M.B. if her mother talks to her about "why you cannot see your daddy." At that time, M.B. hid under the witness stand and the court had to coax her to sit back in the chair. Defense counsel asked whether the question was a "hard question to answer." M.B. nodded her head yes. He then asked if she was "feeling real uncomfortable"; M.B. responded, "I'm feeling uncomfortable . . . with all these people around me . . . . I just want to get out of here." Defense counsel asked her again if her mother talks to her about why she cannot see her dad. M.B. initially nodded her head yes but then responded, "I have no clue." At this point, the following colloquy occurred between the court and defense counsel:

> [DEFENSE COUNSEL]: Your Honor, I'm not making a lot of progress here. I have a lot of other questions that I can ask. All I get is I have no clue, so no further questions. And I would leave it to the Court whether or not this testimony should stand.
> THE COURT: Well, you haven't asked her any substance about the allegations she said on direct, so you haven't attempted to get any answers out of her.
> [DEFENSE COUNSEL]: I asked her about the pictures that she said she didn't recall. I'll continue if the Court desires.
> THE COURT: Well, I just want to make sure that you have an opportunity that you've asked substantive questions, and then we can deal with whatever responses we get after that.

[¶29] Defense counsel resumed questioning M.B.:

> Q. Okay. [M.B.], did anything happen the last time you went to see your daddy?
>
> A. Today is the last time.
>
> Q. What happened?
>
> A. I have no clue.
>
> Q. Why can't you go see your daddy?
>
> A. Because -- because he did something wrong.
>
> Q. Because he did something wrong?
>
> A. He did something wrong.
>
> Q. What did he do that was wrong?
>
> A. I don't like to talk about [it] in front of these people that I don't know. I don't want them to know because --
>
> Q. [M.B.], can you answer without speaking into the microphone? What did he do that was wrong? Don't talk into the microphone because I can't hear you. Just answer me.
>
> A. I have no clue. Buzz, buzz, buzz, buzz, buzz.
>
> [Defense Counsel]: Your Honor, I surrender.

The prosecutor did not have any redirect examination. When the court told M.B. she could step down, M.B. said, "And give my daddy a hug?" The court said, "Not today. I'm sorry."

[¶30] Defense counsel argued the district court should strike M.B.'s testimony. He claimed that although M.B. answered about a dozen of the State's questions, "it was pretty obvious that her answers were practiced," in particular, when she answered "Ella Baldwin," rather than "my mommy," when asked who she lived with. With respect to cross-examination, he argued that although she answered some questions, "every time we attempted to cross-examine her on relevant areas in this . . . case, she would deflect or didn't know." For instance, he attempted to ask her twice about her interview with Ms. Hite but she did not know "Baleigh." He also asked her about what her father did and "nothing on that." According to counsel,

> I believe I tried to do a cross-examination of her, and I don't believe she was available [for] a full cross-examination. She answered some questions, but there were areas where she would just shut down and not answer. . . . We worked too hard to get her to pay attention, and she was too selective on what she would talk about when she wasn't following a prepared script.

The district court decided M.B.'s testimony "wasn't very helpful" but "allow[ed] her testimony to stand."

[¶31] We now turn to Mr. Tamblyn's appellate arguments.

*1. Did the district court abuse its discretion in finding the victim competent to testify as a witness?*

[¶32] "[Wyoming Rule of Evidence 601] presumes . . . 'every person is competent to be a witness except as otherwise provided in these rules.'" *Winters v. State*, 2019 WY 76, ¶ 16, 446 P.3d 191, 199 (Wyo. 2019) (quoting *Hutchinson v. State*, 2012 WY 155, ¶ 5, 290 P.3d 174, 176 (Wyo. 2012)). "Indeed, 'few persons are inherently incapable of testifying in some manner which is potentially useful.'" *Id*. (quoting *Larsen*, 686 P.2d at 585). "'A person is generally competent to testify if he can understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying.'" *Mersereau v. State*, 2012 WY 125, ¶ 6, 286 P.3d 97, 104 (Wyo. 2012) (quoting *Simmers v. State*, 943 P.2d 1189, 1199 (Wyo. 1997)). "[A] witness' intelligence, not his age, should guide a court in determining whether the witness is competent to testify." *Id*. (citing *Baum v. State*, 745 P.2d 877, 879 (Wyo. 1987)).

[¶33] In order for a child witness to be competent, the district court must decide the child has:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Larsen*, 686 P.2d at 585 (quotations omitted). In reviewing a district court's competency determination, "we do not single out isolated statements, but look at the child's entire testimony in determining whether the district court properly ruled she could testify." *Young*, ¶ 15, 418 P.3d at 228 (citations omitted). A "child's statements need not be perfect for her to be considered competent." *Id*. (citations omitted).

[¶34] Mr. Tamblyn does not seriously dispute on appeal the district court's decision that M.B.'s testimony at the competency hearing satisfied the *Larsen* factors. Rather, he claims M.B.'s testimony and behavior at trial demonstrate she was not competent to testify. However, by the time she testified, the district court had already declared her to be competent. *See Griggs v. State*, 2016 WY 16, ¶ 24, 367 P.3d 1108, 1121 (Wyo. 2016) (rejecting Mr. Griggs' reliance on several inconsistencies in the victim's <u>trial</u> testimony as demonstrating the district court's pretrial competency ruling was error because "by the time the victim testified at trial, she had already been declared competent"); *Hutchinson*, ¶ 10, 290 P.3d at 178 (same). In any event, we see no abuse of discretion. Looking to her testimony in its entirety, she was competent to testify.

11

[¶35] M.B. understood the obligation to tell the truth at trial. At the competency hearing, she stated she understood the difference between the truth and a lie, gave examples of each, described the consequences of lying, informed the court that you should tell the truth if you promise to do so, said lying is "wrong" and telling the truth is "right," and promised to tell the truth in the courtroom. At trial, M.B. swore to tell the truth. After the first break, she again agreed to tell the truth. Although she did not know the meaning of the words "real" and "imaginary," she did know what "true" and "not true" meant and gave examples of each. We have found the first *Larsen* factor to be satisfied in similar circumstances. *See Griggs*, ¶¶ 15-19, 367 P.3d at 1120 (first *Larsen* factor satisfied where victims distinguished between the truth and a lie, gave examples of each, and stated lying is wrong); *Sisneros v. State*, 2005 WY 139, ¶ 35, 121 P.3d 790, 801 (Wyo. 2005) (first *Larsen* factor satisfied where victim "indicated she understood [her] responsibility [to tell the truth while in court] and repeated numerous times that lying was 'bad'"); *Watters v. State*, 2004 WY 155, ¶ 18, 101 P.3d 908, 915 (Wyo. 2004) (first *Larsen* factor satisfied where witness "acknowledged that an oath was a promise to tell the truth and that she was willing to take one").

[¶36] M.B. had the mental capacity at the time of the abuse to receive an accurate impression of it. She testified at the competency hearing to the time she stayed with her father, described his house and its living room where the sexual abuse allegedly occurred, recalled there being a chair in the living room and games at his house, and recalled the gifts she had received for her birthday the previous year when the abuse had occurred and when she was still in preschool. At trial, she stated Mr. Tamblyn showed her his privates, it happened at his house, and "Whitley and her baby sister" also lived there. She told defense counsel what she played at his house, recalled her bed at his home, and stated she still had the sheets and blankets.

[¶37] M.B. had a memory sufficient to retain an independent recollection of the abuse, the capacity to express in words her memory of it, and the capacity to understand simple questions about it. At the competency hearing, M.B. told the court: "My daddy showed me his private parts because he put it out of his pocket. He told me to suck it." At trial, when the prosecutor asked her if she knew why she could not see her father right now, she responded, "[b]ecause he showed me his private parts." She also explained her father had showed her pictures and told her "to suck it" but she did not.

[¶38] Mr. Tamblyn claims M.B.'s actions at trial in hiding under the witness stand, testifying through her toy dog, and answering questions with "I have no clue" demonstrate she cannot meet the first *Larsen* factor. According to Mr. Tamblyn, M.B. "not only didn't understand the obligation to speak the truth on the witness stand. It was more basic than that. She didn't understand the need to sit on the witness stand." He also contends M.B's response of "I have no clue" to questions she should have known the answers to shows she cannot satisfy the third, fourth and fifth *Larsen* factors. We disagree.

12

[¶39] The record reveals M.B. hid under the witness table three times during trial. Considering these actions in light of her other testimony, as well as various comments from the district court and defense counsel, it is clear M.B. was uncomfortable discussing the abuse at trial. However, this does not indicate she did not understand the obligation to speak the truth at trial.

[¶40] M.B. answered several questions on cross-examination "through" a toy dog. While she claimed her dog had told her to say she lived with "Ella Baldwin," the other answers she provided "through" her toy dog were not patently false. In this respect, this case is unlike *Mersereau*, where the victim distinguished between the truth and a lie at the competency hearing but his testimony at the hearing and at trial demonstrated he did not understand the obligation to tell the truth at trial. *Mersereau*, ¶¶ 9-12, 286 P.3d at 104-05. In particular, he provided testimony concerning his family and pets he knew was not true, continued to provide untruthful testimony even after being reminded of the need to tell the truth, and commingled his imagination concerning his non-existent pets with the alleged abuse. *Id*.

[¶41] M.B. answered "I have no clue" to the following inquiries: (1) the location of the "rainbow house"; (2) how often her mother says Mr. Tamblyn did not do the right thing; (3) what her mother says in response when M.B. tells her each night that she misses Mr. Tamblyn; (4) what kind of pictures Mr. Tamblyn showed her on his phone; (5) whether her counselor had asked her about missing her dad; (6) whether she had ever talked to "Mr. Taheri" or "Kevin"; (7) whether she knew "Taylor"; (8) whether her mother talks to her about why she cannot see Mr. Tamblyn; and (9) what Mr. Tamblyn did that was "wrong." Her "I have no clue" response to these questions could mean one of three things, none of which rebut the district court's competency determination.

[¶42] First, it could indicate a genuine lack of knowledge. Indeed, there is no indication M.B. necessarily knew the location of the "rainbow house" or how often her mother told her Mr. Tamblyn did not do the right thing. It is also unclear whether M.B. knew to whom defense counsel was referring when he named "Mr. Taheri," "Kevin," and "Taylor," and the record does not reveal any attempt by defense counsel to provide clarification. Indeed, M.B. did not know "Lauren Jackson" but identified her counselor "Miss Lauren." To the extent she did not know the answers to these questions, her "I have no clue" responses, while inartful, were nevertheless truthful.

[¶43] Second, her response may indicate an inability to remember these facts and events. An inability to remember goes to her credibility, not her competency. As we explained in *Young*:

> [T]he *Larsen* test "focuses on the mental abilities of the witness rather than the witness's recollection of specific

events." *Gruwell [v. State],* [2011 WY 67,] ¶ 21, 254 P.3d [223,] 230 [(Wyo. 2011)]. Many witnesses (both children and adults) do not remember certain events or facts. The inability to remember specific matters does not mean a witness is not competent to testify, although it may affect her credibility as a witness. As the district court in this case recognized, competence is not the same as credibility.

*Young*, ¶ 19, 418 P.3d at 229 (some citations omitted).

[¶44] Finally, her response could indicate an unwillingness to answer. This seems the most likely interpretation, especially with respect to those questions pertaining to the abuse as M.B. indicated she was uncomfortable and did not like to talk about what Mr. Tamblyn had done "wrong" in front of people she did not know. *Id.*, ¶ 21, 418 P.3d at 228-29 ("[The victim's] statements that she did not remember the abuse actually show the opposite. Had she truly not remembered, she would not have stated she was scared to talk about it."). But such reluctance to testify at trial does not indicate M.B. did not understand her obligation to speak truthfully. Nor does it refute the third, fourth and fifth *Larsen* factors, especially since she was able to spontaneously speak of the abuse at the competency hearing, recalled the abuse at trial, and answered questions about it during direct examination.

[¶45] The district court did not abuse its discretion in deciding M.B. was competent to testify.

> **2. Was Mr. Tamblyn denied his right to confront a witness against him in violation of the Sixth Amendment of the United States Constitution and Article 1, § 10 of the Wyoming Constitution?**

[¶46] Mr. Tamblyn argues he was denied his right to confront M.B. because she was not competent to testify as a witness and her behavior and flippant answers to his questions at trial thwarted his ability to cross-examine her. We have already decided the district court did not abuse its discretion in finding M.B. competent to testify. As a result, the success of Mr. Tamblyn's Confrontation Clause argument turns on whether her behavior and answers at trial denied him his ability to effectively cross-examine her.

[¶47] "The constitutional right to confront a witness arises under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Wyoming Constitution." *Sparks v. State*, 2019 WY 50, ¶ 41, 440 P.3d 1095, 1108 (Wyo. 2019). "The primary right secured by the Confrontation Clause of the United States and Wyoming Constitutions is the right of cross-examination." *Id.* (quoting *Swan v. State*, 2014 WY 38, ¶ 10, 320 P.3d 235, 238 (Wyo. 2014)). *See also, Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to

rigorous testing in the context of an adversary proceeding before the trier of fact."). The purpose of cross-examination is to test "the believability of a witness and the truth of his testimony." *Sam v. State*, 2017 WY 98, ¶ 17, 401 P.3d 834, 844 (Wyo. 2017) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)). *See also, Counts v. State*, 2012 WY 70, ¶ 32, 277 P.3d 94, 105 (Wyo. 2012) ("One of the most important aspects of the right of cross-examination is attacking the witness' credibility and the truth of the testimony. Credibility may be tested by interrogation that attempts to reveal possible biases, prejudices, or ulterior motives.") (quotations omitted).

[¶48] "[T]o establish a confrontation violation a defendant must show more than just a denial of the ability to ask specific questions of a particular witness. Rather, a defendant must show that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Broussard v. State*, 2017 WY 73, ¶ 18, 396 P.3d 1016, 1023-24 (Wyo. 2017) (quotations omitted). Moreover, while "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 19-20, 106 S.Ct. 292, 294, 88 L.Ed. 2d 15 (1985) (citation omitted).

[¶49] Thus far, the majority of our Confrontation Clause cases have involved one of three scenarios: (1) restrictions on the scope of cross-examination imposed by law or the district court; (2) restrictions on the right of a defendant to physically confront his accuser; and (3) the admission of out-of-court statements by an absent declarant. *See, e.g., Sparks*, ¶ 40, 440 P.3d at 1108 (first scenario); *Schmidt*, ¶ 45, 401 P.3d at 883 (third scenario); *Villarreal v. State*, 2017 WY 81, ¶ 6, 398 P.3d 512, 515 (Wyo. 2017) (third scenario); *Kramer v. State*, 2012 WY 69, ¶ 17, 277 P.3d 88, 93 (Wyo. 2012) (second scenario); *Bush*, ¶ 50, 193 P.3d at 215 (second scenario); *Hannon*, ¶ 14, 84 P.3d at 329 (first scenario). This case does not involve any of the above scenarios. Neither the law nor the district court restricted Mr. Tamblyn's cross-examination of M.B. She physically appeared at trial. And Mr. Tamblyn is not challenging the admission of M.B.'s out-of-court statements.

[¶50] That being said, we have recognized a defendant's inability to meaningfully cross-examine a witness may violate his right of confrontation. In *In Interest of CB*, 749 P.2d 267, 271 (Wyo. 1988), the juvenile defendant argued he was denied the opportunity to meaningfully cross-examine his three-year old victim due to her failure to answer his questions on cross-examination. *Id.* Although we acknowledged "the right to confront witnesses in a criminal trial is critical and implies the ability to put questions to a witness and obtain answers to elicit information and test witness credibility," we found no constitutional violation. *Id.* at 271-72 (citing *Martinez v. State*, 611 P.2d 831, 837 (Wyo. 1980)). We explained:

> This trial record . . . is not an example of an unresponsive witness denying the appellant his right to meaningful cross-examination. While the trial transcript contains testimony in which the victim was not totally responsive, it also contains a minimum of six pages of testimony where the victim answered specific questions pertaining to [C.M.'s] theory of the case. For example, the victim testified at length about what occurred when [C.M.] spanked her in her bedroom the evening of the incident. She also testified that one of [C.M.'s] friends was sleeping on the couch that evening and referred to him by his name. A person is not denied his constitutional rights to confrontation because an adverse witness does not testify in his favor.

*Id*. at 272.

[¶51] Other courts have recognized that "simply putting a child on the stand, regardless of her mental maturity, is not sufficient to eliminate all Confrontation Clause concerns. If, for example, a child is so young that she cannot be cross-examined at all, or if she is 'simply too young and too frightened to be subjected to a thorough direct or cross examination,' the fact that she is physically present in the courtroom should not, in and of itself, satisfy the demands of the Clause." *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1474 (8th Cir. 1991) (quoting *United States v. Dorian*, 803 F.2d 1439, 1446 (8th Cir. 1986)).

[¶52] In *People v. Giron-Chamul*, 245 Cal.App.4th 932, 938-41 (Cal.Ct.App. 2016), the victim, Mr. Giron-Chamul's four-year old daughter, claimed he touched her vagina with his tongue and penis and inserted his finger into her vagina and moved it around. At trial, the daughter testified via closed-circuit television from a jury deliberation room while the parties remained in the courtroom. *Id.* at 942. Her testimony spanned three days, including two days of cross-examination, and involved numerous and frequent breaks. *Id*. at 943-53, 961. Although she answered some substantive questions about the abuse, the majority of the time she resisted responding to such questions by disappearing under the table (over 20 times), saying she did not know, refusing to answer, trying to change the subject, "talking crab" (moving her lips without making a sound), refusing to face the camera, providing unintelligible responses, hiding behind a chair, drawing on a whiteboard, calling defense counsel "boring," and telling him she was "ignoring" him and to leave her alone. *Id*.

[¶53] On appeal, Mr. Giron-Chamul argued the daughter's trial testimony demonstrated she was incompetent to testify and her refusal to answer questions on cross-examination denied him his right of confrontation. *Id*. at 958-59, 961. The California appellate court found no abuse of discretion with respect to the trial court's competency determination but agreed Mr. Giron-Chamul's right to confrontation had been denied because he did not have an adequate opportunity to effectively cross-examine the daughter. *Id*. at 958, 961. With

16

respect to his confrontation claim, the court determined the case law "suggest[ed] a continuum on which the right to an opportunity for effective cross-examination is more likely violated as the number of relevant questions that go unanswered increases." *Id.* at 968. It concluded it "need not determine the exact line on the continuum when a child witness's refusal to answer questions impedes cross-examination enough to violate the confrontation clause because the line was clearly crossed here." *Id.* It explained:

> Here, daughter refused to answer hundreds of questions, of which approximately 150 were substantive. And nothing about her lack of cooperation can be attributed to the trial court, prosecutor, or defense counsel, all of whom took laudable measures to try to make it easier for her to testify. These measures included having daughter testify by closed-circuit television, taking frequent recesses during daughter's testimony and breaking early, allowing daughter to move about, draw, and eat while testifying, and questioning daughter gently and at length on safe but irrelevant topics. The trial court and defense counsel also both encouraged the prosecutor's efforts in urging daughter to cooperate, and defense counsel tried to build rapport with daughter rather than to antagonize her. He treated her kindly, did not badger her or become confrontational, and did nothing to cause her to be reticent except to ask her questions—as he was fully entitled to do—about topics she did not want to discuss.
>
> Despite these measures, daughter refused to respond to many questions that were crucial to testing her claims, particularly those involving her drawing and her report to the day care provider, the forensic interview, and other possible explanations for her apparent sexual knowledge. Nor would she respond to many questions bearing on her credibility more generally, such as follow-up questions about her assertion that Giron-Chamul had defecated in her hair. . . . Daughter's failure to respond to questions on critical topics deprived Giron-Chamul of a full and fair opportunity to probe and expose . . . . infirmities in her testimony and out-of-court statements . . . and her testimony should have been stricken.

*Id.* at 968-69 (quotations and citation omitted).

[¶54] Similarly, in *Commonwealth v. Kirouac*, 542 N.E.2d 270, 271 n.2, 272 (Mass. 1989), the six-year-old victim (four at the time of the abuse) testified "reluctantly" on direct examination as to what occurred between her and Mr. Kirouac but did testify he touched

17

her on her "tookie," the word she used to describe her genitalia. After she announced she was tired, the prosecutor attempted to obtain further information from her without success. *Id.* at 272. The trial was adjourned for the day. *Id.* The next day, the victim resisted answering nearly all questions put to her on cross-examination. *Id.* In particular, when asked about her inculpatory testimony the previous day, the victim said she did not remember, was tired, and wanted to go to her nanny's house. *Id.* at 272 n.4. The Massachusetts Supreme Court concluded the victim's lack of cooperation during cross-examination denied Mr. Kirouac any meaningful opportunity for cross-examination in violation of the Confrontation Clause. *Id.* at 270. It reasoned:

> In deciding whether a defendant's constitutional right to cross-examine and thus confront a witness against him has been denied because of an unreasonable limitation of cross-examination, a court must weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination. The determination can only be made on a case-by-case basis. Cross-examination that is somewhat impeded, but not totally foreclosed, presents a weaker case for finding a denial of rights than a complete absence of cross-examination. . . .
>
> [The victim's] testimony was crucial to the prosecution's case, and her total refusal to cooperate on cross-examination was so prejudicial as to deny the defendant his constitutional right to cross-examine her. The issue in this case is not whether the defendant had an opportunity to cross-examine that was not exercised and hence waived. *See* 5 J. Wigmore, Evidence § 1371 at 55–56 (Chadbourn rev. ed. 1974 & Supp.1989). This case more closely parallels a case in which a witness declines to answer all relevant questions on cross-examination or, because of illness or otherwise, is unavailable for cross-examination.

*Id.* at 273. In so concluding, the court distinguished the victim's refusal to cooperate in that case with a prior case wherein the seven-year-old child witness, in response to some of defense counsel's questions about matters to which she had testified earlier, stated she did not remember, yet "answered almost all questions asked of her, did not assert a lapse of memory as a general response to questions, and appear[ed] to have fully and willingly participated in the cross-examination to the best of her ability." *Id.* at 274.

[¶55]  In contrast, in *State v. Habersat*, No. 2009AP976–CR, 2010 WL 2671288, *1 (Wis. Ct. App. July 7, 2010) (unpublished), Mr. Habersat was charged with sexually assaulting five-year-old Cody by placing his mouth on Cody's penis while they were alone in Mr.

Habersat's garage. At trial, Cody (then seven years old) briefly testified. *Id*. at *2. His testimony spanned seven pages of transcript and consisted mainly of the prosecutor and defense counsel "attempting to elicit from Cody answers to a series of questions such as whether he knew his colors, the difference between a truth and a lie, his first-grade teacher's name and his birth date." *Id*. Neither side asked Cody any questions about the alleged assault. *Id*. Mr. Habersat was convicted and, on appeal, he argued his counsel was ineffective for failing to seek a mistrial because Cody's answers indicated he was unavailable for any meaningful cross-examination in violation of the right to confrontation. *Id*. at *2, 7. The court rejected that argument:

> The trial court . . . recognized that Cody 'was a very young witness who did not have a complete understanding of what was happening and who was clearly intimidated by the proceeding.' However, as the trial court noted, Cody was produced and was available for cross-examination. Cody struggled answering questions on both direct and cross-examination, but he ultimately was able to testify that he was seven years old and in the first grade, and he was able to identify Habersat. On cross-examination, he acknowledged that Habersat used to live near him, that Habersat lived with [his fiancé], that he did not recall ever going to the State Fair and that he 'came here to talk to us about stuff.'
>
> Habersat argues that the transcript indicates that Cody 'could not and did not answer questions.' That is simply not true. As noted above, the transcript indicates that Cody was able to answer some questions, either verbally or by nodding or shaking his head. In answer to other questions, he indicated he did not know. This is not a situation where Cody refused to answer questions on cross-examination or was completely unable to do so. Rather, trial counsel elicited some answers and then, without explanation, ended his cross-examination. Perhaps he believed he had successfully shown that Cody was not a reliable witness, or perhaps he was concerned about appearing to badger a sympathetic witness. For whatever reason, trial counsel did not ask Cody questions about what occurred in Habersat's garage or about his taped interview. Trial counsel made the decision to cease questioning. Whether asking additional questions, or taking a break and then resuming questioning, would have led Cody to give more confident and detailed answers, or whether he would have refused to answer any questions, are issues about which we

19

decline to speculate. Trial counsel was not deprived of the opportunity to cross-examine Cody.

*Id*. at *7.

[¶56]   In *United States v. McHorse*, 179 F.3d 889, 894 (10th Cir. 1999), Mr. McHorse was charged with sexually abusing three of his nieces. At trial, the government called another niece, seven-year-old Jane Doe E, to testify that Mr. McHorse had sexually abused her when she was four. *Id*. at 894-95. She could not remember, however, what Mr. McHorse had done to her and he chose not to cross examine her. *Id.* at 895, 899. Nevertheless, he argued on appeal that because Jane Doe E could not remember what he had done to her, he could not effectively cross-examine her. *Id.* at 899. The Tenth Circuit disagreed:

> In this case, Defendant had the opportunity to use Jane Doe E's lack of memory to attack her credibility as a witness. But because Jane Doe's testimony was minimally, if at all harmful to Defendant, he had little, if anything to attack. *Cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)   (Confrontation Clause ensures right of a defendant to face those *who testify against him*). Defendant chose not to cross-examine Jane Doe E because cross-examination may have jogged her memory, resulting in testimony damaging to Defendant. Accordingly, we conclude that Jane Doe's failure to recall the alleged incidents of sexual abuse against her coupled with Defendant's strategy choice not to cross-examine her regarding her lack of memory did not violate Defendant's rights under the Confrontation Clause.

*Id*. at 900.

[¶57]   We agree with the *Kirouac* court that whether a defendant has been denied his right to effectively cross-examine a child witness due to the witness's behavior or answers at trial must be decided on a case-by-case basis. Factors relevant to the determination include (1) the extent of the witness's failure to cooperate, including the number and nature of unanswered questions and the victim's motive for not answering (i.e., whether the failure to answer was due to a lack of memory or knowledge or constituted a refusal to answer); (2) the degree to which the trial court, prosecutor or defense counsel contributed to the witness's failure to cooperate or failed to take measures to make it easier for the witness to testify; and (3) the extent to which a lack of cross-examination was the result of strategic choice by defense counsel.

[¶58]   M.B.'s behavior in hiding under the witness stand, answering certain questions through a toy dog, and answering some questions with "I have no clue" was certainly

20

problematic. However, she provided verbal responses to practically all of defense counsel's questions including substantive ones about the abuse and any undue influence by her mother or others. Indeed, she testified she told her mother she missed her father, her mother told her she had to "deal with it" because he did not do the right thing, her mother did not tell her what her father did wrong, she had only talked with her mother about what her father had done, she had only spoken with her mother prior to testifying, and she could not see or live with her father because he did something wrong.

[¶59] As stated above, she answered some questions with "I have no clue." However, as also explained above, the record does not reveal whether these answers constituted a refusal to answer questions or rather represented a lack of knowledge, an inability to recall, a misunderstanding of a vague question, or a combination thereof. *Cf. Schmidt v. State*, 2001 WY 73, ¶ 30, 29 P.3d 76, 85 (Wyo. 2001) ("[Mr. Schmidt] had a full and complete opportunity to confront the victim. If he failed to fully avail himself of that opportunity through inartful and objectionable questioning, then that is a matter relating to the admission of evidence, not the Confrontation Clause."). What is clear, however, is that M.B. was uncomfortable talking about what Mr. Tamblyn had done "wrong" in front of people she did not know. Yet, other than requesting a short recess after direct examination and a break in the middle of cross-examination, defense counsel did not take any other measures to eliminate her discomfort. He did not seek another break or an evening recess. He did not attempt to ask her leading questions about the abuse. Rather, he simply "surrender[ed]." As in *Habersat*, "[w]hether asking additional questions, or taking a break and then resuming questioning, would have led [M.B.] to give more confident and detailed answers, or whether [s]he would have refused to answer any questions, are issues about which we decline to speculate." *Habersat*, 2010 WL 2671288 at *7.

[¶60] Defense counsel's lack of effort leads us to believe his cessation of questioning was strategic. He may not have wanted to appear to be badgering a sympathetic witness, although admittedly that is less of a concern when, as here, the judge is the fact-finder. Or, more importantly, he may not have wanted to risk further damaging disclosures. M.B. testified on direct only that Mr. Tamblyn showed her his private parts. Further inquiry may have led her to disclose he also made her touch his penis.

[¶61] In sum, M.B. answered almost all of the questions posed to her. Her motive in not answering some questions may have been due to a lack of memory, a lack of knowledge or a misunderstanding of an imprecise question as opposed to a refusal to answer. Defense counsel's cessation of questioning appears to have been strategic. This case is more akin to *CM*, *Habersat* and *McHorse* than *Giron-Chamul* and *Kirouac*. Mr. Tamblyn was not denied his right to effectively cross-examine M.B.

[¶62] Any error was also harmless beyond a reasonable doubt. *Broussard,* ¶ 24, 396 P.3d at 1026. *See also, Hannon*, ¶ 11, 84 P.3d at 328 (applying a "harmless error analysis" in assessing whether a Confrontation Clause violation has occurred).

21

[T]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Broussard,* ¶ 18, 396 P.3d at 1024 (quoting *Hannon*, ¶ 25, 84 P.3d at 332-33, and *Olden v. Kentucky*, 488 U.S. 227, 232-33, 109 S.Ct. 480, 483-84, 102 L.Ed.2d 513 (1988)).[3]

[¶63]   Assuming Mr. Tamblyn would have been able to wholly discredit M.B.'s testimony had he been able to effectively cross-examine her, the verdict would not have been different because her testimony was not the only evidence of guilt.  Ms. Baldwin, M.B.'s foster mother, Ms. Hite, and Ms. Jackson testified M.B. disclosed Mr. Tamblyn had showed her his penis and she touched it.[4]  Importantly, Mr. Tamblyn himself corroborated the abuse. Indeed, while M.B. testified only that he showed her his penis, Mr. Tamblyn admitted she touched it twice.  He also admitted it was possible he had a partial erection at that time. Moreover, S.H.'s testimony demonstrated Mr. Tamblyn's motive in acting as he did was for sexual gratification.

## CONCLUSION

---

[3] In *Bowser v. State*, 2009 WY 54, ¶ 14, 205 P.3d 1018, 1024 (Wyo. 2009), we concluded the district court erred in allowing the minor victim's trial testimony to be taken via video deposition under Wyo. Stat. Ann. § 7-11-408 and the seating arrangement at the video deposition violated Mr. Bowser's constitutional right to confront a witness against him because he was prevented from seeing her while she testified.   In determining whether the error was harmless, we concluded we "must disregard [the victim's] testimony entirely.  'An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.'"  *Id.*, ¶ 14, 205 P.3d at 1024 (quoting *Coy v. Iowa*, 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988)).  *Bowser* and *Coy* appear to be limited to the denial of face-to-face confrontation.  In any event, the same result ensues.  As we will explain, under the harmlessness standard outlined in *Broussard*, we assume Mr. Tamblyn would have been able to wholly discredit M.B.'s testimony had he been allowed to effectively cross-examine her.  In other words, we disregard her testimony entirely.

[4] Mr. Tamblyn does not challenge the admission of their testimony on appeal.

[¶64]   The district court did not abuse its discretion in finding M.B. competent to testify. Mr. Tamblyn was not denied his right to effectively cross-examine M.B. and any error was harmless beyond a reasonable doubt.

[¶65]   We affirm Mr. Tamblyn's convictions and sentences.