# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 26

### OCTOBER TERM, A.D. 2025

**February 24, 2026**

JOSHUA JOHN O'DELL,

Appellant
(Defendant),

v.                                                                    S-25-0098

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
The Honorable Matthew F.G. Castano, Judge

*Representing Appellant:*
Office of the State Public Defender: Brandon T. Booth, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Sean H. Barrett, Senior Assistant Appellate Counsel. Argument by Mr. Barrett.

*Representing Appellee:*
Keith G. Kautz, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Senior Assistant Attorney General. Argument by Mr. Woykovsky.

*Before BOOMGAARDEN, C.J., GRAY, FENN, JAROSH, JJ., and EAMES, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]     A jury convicted Joshua John O'Dell of two counts of first-degree sexual assault of a minor.  On appeal, Mr. O'Dell challenges several of the district court's rulings at trial. First, he asserts the district court abused its discretion and violated the Confrontation Clauses of the United States and Wyoming Constitutions when it limited his cross-examination of the victims related to their violations of a sequestration order.  In addition, Mr. O'Dell contends the district court abused its discretion when it denied two motions for mistrial after Mr. O'Dell objected to purportedly inadmissible evidence under Wyoming Rule of Evidence (W.R.E.) 404(b).  Finding no error, we affirm.

## ISSUES

[¶2]     Mr. O'Dell asserts five issues on appeal, which we rephrase as follows:

1.  Did the district court abuse its discretion when it limited the scope of Mr. O'Dell's cross-examination of JB and FO related to their violations of the sequestration order?

2.  Did the district court violate the Confrontation Clauses of the United States and Wyoming Constitutions when it limited the scope of Mr. O'Dell's cross-examination of JB and FO related to their violations of the sequestration order?

3.  Did the district court abuse its discretion when, during JB's testimony, it sustained an objection under W.R.E. 404(b) but did not order a mistrial?

4.  Did the district court abuse its discretion when, later during JB's testimony, it overruled an objection under W.R.E. 404(b) and did not order a mistrial?

5.  Does cumulative error warrant reversal?

## FACTS

*Background*

[¶3]     Joshua O'Dell moved in with Brandie Ave and her daughter JB in October 2005 when JB was six months old.  In April 2007, Mr. O'Dell and Ms. Ave had a daughter together, FO.  Mr. O'Dell and Ms. Ave married in September 2010.

[¶4]     Years later, in March 2022, Ms. Ave, JB, and FO moved out of the family home. One month later, just after her fifteenth birthday, FO moved back home with Mr. O'Dell.

1

[¶5]    In September 2022, JB disclosed to her probation officer and then to a police detective, Nicole Hahn, that Mr. O'Dell sexually abused her when she was nine years old. JB reported that Mr. O'Dell "trained" her to undress every time he snapped his fingers. JB also reported Mr. O'Dell would write notes/letters[1] to her that were sexual in nature and that her sister, FO, found some of the notes and "knew what [Mr. O'Dell] was doing." She also reported Mr. O'Dell would make her sleep naked with no blankets so he could look at her anytime he wanted.

[¶6]    JB reported an incident in which Mr. O'Dell called her down to the basement and made her perform fellatio on him. JB began crying and told him "no," but he said he did not care what she said, and she better do it or he would "beat her ass." She did as she was told and performed fellatio on Mr. O'Dell for approximately one or two minutes but stopped when they heard the front door open and Ms. Ave and FO entered the house.

[¶7]    In April 2023, Detective Hahn also spoke with FO, who confirmed Mr. O'Dell would ask FO to pass notes to JB. FO also reported that in 2022, when she was fifteen, Mr. O'Dell forced her onto his bed and began to kiss her all over her body, from her breasts to her thighs. He then inserted two fingers into her vagina. FO stated she was screaming and kicking, but Mr. O'Dell would not stop.

### Charges

[¶8]    The State charged Mr. O'Dell with two counts of first-degree sexual abuse of a minor and alleged Mr. O'Dell inflicted sexual intrusion on JB by having her perform fellatio on him, and inflicted sexual intrusion on FO by digitally penetrating her vagina.

### Trial – Sequestration of Witnesses

[¶9]    Prior to trial, the district court granted Mr. O'Dell's motion to sequester witnesses. On the second day of trial, Ms. Ave testified. At the conclusion of her testimony, the State asked the court to investigate a report that one or both victims were in the hallway and may have overheard someone livestreaming the trial on a phone. The court stated it would question both victims about what happened and allow each party to make "narrow" inquiries of each witness as well.

[¶10]   Outside the presence of the jury, the court questioned each witness about what they heard. JB admitted she heard the livestream of the trial being broadcast from her cousin's phone in the hallway when the court was "getting mad" for "maybe 30 seconds, 45 seconds." She testified she "couldn't remember" anything else, and that she "wasn't

---

[1] The parties and the record use both "notes" and "letters" to describe the written communications from Mr. O'Dell to JB. For continuity, we will use the phrase "notes" in this opinion.

paying attention to [the livestream]" because she was on her own phone. She testified she did not hear any witness testimony. JB further testified that she was not told she "wasn't allowed to listen to [the trial]," just that she "couldn't be in the courtroom."

[¶11] FO also admitted she heard the livestream on her cousin's phone, and that it played for less than five minutes. She testified she did not realize the phone was streaming the trial, and that she was looking at her own phone and not paying attention. She testified she "heard people talking" and "yelling," but she did not hear "what exactly was said" nor did she recognize any of the voices she heard. She did know her mother was in the courtroom at the time. FO testified that at no point did she hear her mother's voice. When asked if she was told she could not listen to the trial, she answered, "the attorney and [the prosecutor] told us that we weren't allowed to listen to anything about it."

[¶12] Another witness, Raechell O'Dell, was also subject to the sequestration order and instructed not to listen to the trial. She testified that she listened to approximately eight minutes of the livestream around 9:37 a.m. on the first morning of trial. The court took notice that what she heard was during the early portion of voir dire, and not during any witness testimony.

[¶13] The district court did not find "any coordination, cooperation, [or] connivance" in relation to JB, FO, and Raechell O'Dell overhearing the livestream. The court further concluded JB overheard only a portion of the trial during which the jury was excluded from the courtroom, which was "nontestimonial in nature," and neither JB nor FO were intentionally listening or paying attention, according to their testimony. As for Raechell O'Dell, the court concluded she only listened to a portion of voir dire which was nontestimonial. *Id.*

[¶14] The court also concluded JB, FO, and Raechell O'Dell did not hear any testimony. The Court then denied Mr. O'Dell's request to exclude JB's and FO's testimony as a sanction for their alleged violations of the sequestration order. Instead, the court ruled Mr. O'Dell could cross-examine JB and FO about what they heard in the hallway. The district court limited cross-examination to three questions about whether JB and FO heard anything that would taint their own testimony. The court stated, "That cross examination will be limited as such: 1) Did you listen? 2) How much did you listen to? 3) What, if anything, did you learn in the course of listening to that?" The court found "that strikes the balance … between any potential taint that may be something that the jury needs to know in determining whether or not the State has proved its case against Mr. O'Dell and allowing Mr. O'Dell, as well, the freedom of a defense in this matter with regard to that there has been testimony that has been fabricated, harmonized, et cetera, with regard to having heard other testimony." Regarding Mr. O'Dell's request to examine the witnesses regarding the fact that they violated a court order, the court concluded by stating,

3

… when the purpose of the rule -- or the purpose of exclusion of witnesses is to avoid bleedover between the two, the Court's order really is irrelevant to that issue to the Court. I mean, to do otherwise would just be generally to put forward some notion of disobedience of these witnesses, and the Court finds that probably more prejudicial than probative when the probative portion of it is what was heard.

### *Trial Testimony – Sequestration*

[¶15]   Later in the trial, both JB and FO testified and were cross-examined about listening to the livestream of the trial.  First, Mr. O'Dell questioned JB about what she heard in the hallway.  He asked her if she listened to a livestream of the trial.  She replied, "just of the judge," for "maybe 30 seconds."  She testified she had found livestreams for other cases before on Google, and she showed her cousin how to do that.  She also stated she "didn't know [her cousin] was going to sit there and listen to it."  She also testified she heard the livestream from her own phone, which contradicted her statements from the day before about hearing the livestream from her cousin's phone.  As a result, Mr. O'Dell's counsel questioned JB about her prior statement.

[¶16]   FO also testified on cross-examination that she heard the trial being livestreamed in the hallway on her cousin's phone.  When asked how long she listened to it, she answered, "[n]ot long at all."  She testified her cousin was only sitting by her for "three, four minutes" but that she was looking at her own phone and "wasn't necessarily listening to [her cousin's phone]."  FO denied talking about the trial with JB while they were in the hallway.

### *Motions for Mistrial – Alleged Rule 404(b) Violations*

[¶17]   During trial, JB testified that when she was about nine or ten years old Mr. O'Dell called her downstairs to the basement living room.  She said Mr. O'Dell was sitting on the couch near the fireplace when he unzipped his pants, exposed his penis, and told JB to "suck his d*ck."  JB "tried to refuse it" by saying "no," and she started to cry.  Mr. O'Dell told her, "[n]ow," and that if she didn't do "what [she] was supposed to," she would "get [her] ass whooped."  JB was on her knees and placed Mr. O'Dell's penis in her mouth for about two minutes when she heard her mother and sister come in the front door.  Mr. O'Dell then told JB to get upstairs, and "[n]ot to tell my mom or sister or anyone," or else she would "get [her] ass whooped."

[¶18]   When asked if she ever told her sister, JB replied she did.  The State then asked, "And when you tell her, do you make it clear to her or advise her not to tell anybody?"  JB responded, "I never told her about that incident, just about other times."  Mr. O'Dell then objected and moved for a mistrial on the basis of Rule 404(b).  Mr. O'Dell argued because there was only one charged incident related to JB at issue, JB's comment about "other

4

times" was in reference to other sexual acts and the State had not filed a notice to use 404(b) evidence. The district court sustained the objection, struck JB's response, and instructed the jury to disregard it. The court denied the motion for a mistrial.

[¶19] During cross-examination, Mr. O'Dell questioned JB about the differences between what she told police during interviews and what she wrote in her written statement. JB agreed that she did not say anything during the interviews about Mr. O'Dell sending her notes. On re-direct, JB testified that Mr. O'Dell had "passed her [notes]" that were sexual in nature. When asked what the notes specifically said, JB responded they said, "if I got my best friend … or babysitter at the time … to basically take my spot, then he would stop with me."

[¶20] Mr. O'Dell objected and moved for a mistrial on the ground that JB's testimony referenced "other sexual acts again," and "insinuating there's a bunch of character evidence out here that is completely uncharged[.]" The district court denied Mr. O'Dell's motion stating JB's testimony did not implicate "anything other than what is potentially the charged conduct here."

### Remainder of Trial, Verdict, and Sentence

[¶21] Finally, FO testified regarding Mr. O'Dell's abuse of her. She testified Mr. O'Dell came into her bedroom in June 2022 and pulled down his pants and pushed her onto her bed. They argued about what Mr. O'Dell had done to JB, and he said he would "show [FO] what he did to [JB] because [FO] wanted to believe it." Mr. O'Dell then leaned over FO, pulled down her boxer shorts, kissed "all the way up [her] front" including her breasts and then forcefully inserted two fingers "in and out" of FO's vagina. FO repeatedly asked him to stop, but he did not. Mr. O'Dell told FO there would be consequences if anyone ever found out what happened. FO testified she was scared to leave but eventually moved out in March 2023.

[¶22] Mr. O'Dell testified in his own defense and denied the allegations against him. The jury found Mr. O'Dell guilty of both counts of first-degree sexual abuse of a minor and the district court sentenced him to consecutive terms of twenty-five to forty years in prison for each count.

[¶23] This appeal followed.

### STANDARD OF REVIEW

[¶24] The sanctions imposed for violation of sequestration orders are reviewed for an abuse of discretion. *K.C. v. State*, 2004 WY 74, ¶ 9, 92 P.3d 805, 807 (Wyo. 2004). We also review rulings on the admissibility of evidence for an abuse of discretion. *Testerman v. State,* 2025 WY 58, ¶ 27, 568 P.3d 1206, 1215 (Wyo. 2025) (citation modified). In

considering whether there was an abuse of discretion, we consider whether the district court could reasonably conclude as it did. *Id.* (quotation omitted). "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion." *Id.* (quotation omitted). Only if we find the evidence was admitted in error do we then consider whether the evidence was prejudicial. *Nania v. State*, 2025 WY 16, ¶ 15, 562 P.3d 1306, 1310 (Wyo. 2025). We also review the denial of a motion for mistrial for an abuse of discretion. *Langley v. State,* 2020 WY 135, ¶ 18, 474 P.3d 1130, 1135 (Wyo. 2020) (citation modified).

[¶25] Mr. O'Dell's Confrontation Clause argument is a question of law this court reviews de novo. *Tamblyn v. State,* 2020 WY 76, ¶ 13, 465 P.3d 440, 445 (Wyo. 2020) (citing *Schmidt v. State,* 2017 WY 101, ¶ 22, 401 P.3d 868, 878 (Wyo. 2017)) (citation modified).

## DISCUSSION

**I.      The district court did not abuse its discretion or violate the Confrontation Clauses when it limited cross-examination of the witnesses who violated the  sequestration order.**

### *a.     The district court did not abuse its discretion in determining the remedy for violating the sequestration order.*

[¶26] Mr. O'Dell contends the district court abused its discretion by not allowing him to conduct a more robust cross-examination of JB and FO regarding listening to the livestream of the trial while they were in the hallway. Specifically, Mr. O'Dell contends he should have been permitted to question both witnesses about the fact that in doing so, the witnesses violated a court order.

[¶27] W.R.E. 615 provides that, at the request of either party, the court shall order witnesses excluded so they cannot hear the testimony of other witnesses. *K.C.,* ¶ 11, 92 P.3d at 807 (quoting *Towner v. State*, 685 P.2d 45, 47-49 (Wyo. 1984)). The purpose of sequestration is to prevent witnesses from tailoring their testimony to that of prior witnesses and to aid in the detection of falsehoods and testimony that is less than candid. *Id.* (citations omitted). Whether a sequestration order has been violated, and what remedy, if any, is appropriate, lies within the sound discretion of the trial court. *Id.,* ¶ 9, 92 P.3d at 807 (quoting *Cook v. State,* 7 P.3d 53, 58-59 (Wyo. 2000)). When a violation is alleged, a court must consider the circumstances of the violation and whether it resulted in prejudice to the opposing party. *K.C.,* ¶ 11, 92 P.3d at 807-08.

[¶28] Although Rule 615 does not prescribe specific sanctions for violations, courts generally recognize three potential remedies:  hold the witness in contempt; permit cross-

6

examination and comment on the violation; or exclude testimony altogether. *Id.* (citations omitted). Exclusion of testimony is an extreme remedy, generally reserved for situations involving bad faith or demonstrable prejudice. *See id.,* ¶ 11, 92 P.3d at 807 ("Exclusion of the witness' testimony is too grave a sanction where the violation was not intentional and was not procured by the connivance of the party or his counsel.") Generally, excluding testimony is strongly disfavored where the party offering the witness neither knew of nor procured the violation. *Id.,* ¶ 11, 92 P.3d at 808 (citation modified).

[¶29] Here, the witnesses overheard a livestream of a brief portion of the trial while waiting to testify. Upon learning about the conduct, the State brought it to the attention of the district court. Thereafter, the district court and counsel conducted an examination of JB and FO outside the presence of the jury to determine the extent to which they listened to the trial in violation of the sequestration order. Once it concluded that the violation was minimal, and that neither witness heard any actual testimony, the district court determined the appropriate remedy was to permit defense counsel to conduct a limited cross-examination on the nature and extent of each witness's exposure to the trial proceedings. The court authorized three specific questions: "1) Did you listen; 2) How much did you listen to; and 3) What, if anything, did you learn in the course of listening to that"?

[¶30] Thereafter, JB and FO testified in front of the jury about what they heard.[2] On cross-examination, JB testified she heard the livestream of the trial for "[m]aybe 30 seconds," and "[j]ust of the judge." FO testified she heard the livestream for three or four minutes but was scrolling on her own phone and "wasn't necessarily listening to it." Critically, JB's and FO's testimony revealed that neither heard any testimony from another witness.

[¶31] In considering whether the district court abused its discretion, we must keep in mind that "[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily and capriciously." *Miller v. Beyer*, 2014 WY 84, ¶ 14, 329 P.3d 956, 961 (Wyo. 2014) (quotations and citations omitted). Again, in assessing whether there has been an abuse of discretion, our focus is on the reasonableness of the district court's decision. *Id.*

[¶32] Based on the record, we cannot find that the district court abused its discretion. The violation of the sequestration order was minimal, as neither witness heard any actual testimony. As a result, there was no risk that JB or FO conformed their testimony to that of a prior witness or that a prior witness's testimony impacted their testimony in any manner. In addition, Mr. O'Dell did not suffer any prejudice related to JB's or FO's violation. While Mr. O'Dell asserts he should have been permitted to inquire into the fact that by listening JB and FO violated a court order, any such testimony would have been irrelevant. The issue was whether they heard testimony and conformed their testimony to

---

[2] Raechell O'Dell was not questioned in front of the jury about listening to the livestream.

what they heard. They did not. Even if there was some marginal relevance to the fact that JB and FO violated a court order, it was substantially outweighed by the danger of unfair prejudice under W.R.E. 403—specifically, the danger associated with the jury learning that JB and FO had been disobedient to the court.

[¶33] The district court's response to the sequestration violation was reasonable. The court did not abuse its discretion when it limited cross-examination of JB and FO related to what they overheard on the livestream by precluding Mr. O'Dell from questioning them about violating a court order.

### b. The district court's rulings did not violate the Confrontation Clauses.

[¶34] Mr. O'Dell also argues limiting his ability to cross examine JB and FO regarding violation of the district court's sequestration order violated his right to confront those two witnesses under the Confrontation Clauses of the United States and Wyoming Constitutions.

[¶35] The Sixth Amendment of the United States Constitution and Article 1, Section 10 of the Wyoming Constitution provide that a person accused of a crime has the right to confront a witness against him in a criminal action. *Detimore v. State,* 2024 WY 109, ¶ 17, 557 P.3d 1172, 1177 (Wyo. 2024) (citation omitted). The primary right of the Confrontation Clauses is the right of cross-examination. *Id.* (quoting *Miller v. State,* 2006 WY 17, ¶ 8, 127 P.3d 793, 796 (Wyo. 2006)). The purpose of cross-examination is to test "the believability of a witness and the truth of [their] testimony." *Tamblyn,* ¶ 47, 465 P.3d at 452 (citations omitted). Although a defendant's right to confrontation may not be denied, it can be limited. *Miller,* ¶ 8, 127 P.3d at 796.

[¶36] To establish a Confrontation Clause violation, a defendant must show more than just a denial of the ability to ask specific questions of a particular witness. *Detimore,* ¶ 17, 557 P.3d at 1177. Rather, a defendant must show they were prohibited from engaging in ***otherwise appropriate cross-examination*** designed to show a prototypical form of bias and to provide the jury with facts from which it could reasonably assess the witness's reliability. *Id.* (quoting *Miller,* ¶ 8, 127 P.3d at 796) (emphasis added). The Confrontation Clause guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* The right is "not unfettered." *Id.* Where the jury is made aware of facts bearing on a witness's credibility, the Constitution is satisfied even if the defense is not permitted to explore every conceivable line of impeachment. *Id.* (recognizing questioning that is "repetitive or of marginal relevance" is subject to the trial court's discretion).

[¶37] Here, both JB and FO testified live and under oath about the charges against Mr. O'Dell. Additionally, the district court also allowed Mr. O'Dell to ask them the three

8

specific questions about the sequestration violation: 1) Did you listen? 2) How much did you listen to? 3) What, if anything, did you learn in the course of listening to that? These questions directly addressed the core purpose of sequestration, which was to prevent the witnesses from tailoring their testimony. Further, the jury was able to evaluate whether the witnesses' testimony was influenced by exposure to other evidence, thereby allowing "enough information to make a discriminating appraisal of the witnesses' credibility." *See* 23 C.J.S. Criminal Procedure and Rights of Accused, § 906.

[¶38] Importantly, defense counsel was not prohibited from arguing credibility generally, and did so. Both witnesses were also subject to full cross-examination by Mr. O'Dell. Although Mr. O'Dell sought to further question the witnesses about the violation of the sequestration order, the district court properly limited that inquiry, as explained above. Simply put, whether the witnesses violated a court order was irrelevant. Because Mr. O'Dell was not prohibited from engaging in otherwise appropriate cross-examination, there was no violation of the Confrontation Clauses.

## II.     The district court did not abuse its discretion in ruling on Mr. O'Dell's objections to JB's testimony or by not granting Mr. O'Dell's motions for mistrial.

[¶39] Mr. O'Dell argues the district court erred when it did not declare a mistrial after JB testified, "I never told her about that incident, just about the other times."

[¶40] W.R.E. Rule 404(b) states,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶41] We have consistently held when a district court is presented with a motion for a mistrial, justice requires the motion be granted only if the appellant has been prejudiced because his or her substantial rights were abridged. *Salinas v. State,* 2016 WY 97, ¶ 15, 380 P.3d 647, 650 (Wyo. 2016) (quotations omitted). Granting a mistrial is an extreme and drastic remedy that should only be invoked in the face of an error so prejudicial that justice could not be served by proceeding with trial. *McGill v. State,* 2015 WY 132, ¶ 11, 357 P.3d 1140, 1145 (Wyo. 2015) (quotation omitted). The district court must determine whether the conduct was "so prejudicial that justice could not be served by proceeding with trial." *Id.*, ¶ 8, 257 P.3d at 1144 (quoting *Warner v. State,* 897 P.2d 472, 474 (Wyo.1995)). The district court is in the best position to assess the prejudicial impact of such error. *McGill,* ¶ 11, 357 P.3d at 1145 (quotation omitted).

[¶42] On review, we must resolve whether the district court abused its discretion in denying the mistrial, and if so, whether that denial prejudiced Mr. O'Dell. *Id.* (citing *Drury v. State,* 2008 WY 130, ¶ 8, 194 P.3d 1017, 1019 (Wyo. 2008) ("Appellant has the burden of showing that she was prejudiced by the district court's denial of the motion for mistrial.")). Evaluating Mr. O'Dell's claim requires consideration of the challenged testimony in context. On direct examination, the State asked JB, "Did you ever have any fears of being believed?" She replied, "Sometimes." The State then asked, "Now, at some point do you tell your sister?" JB replied, "Yes." The State then asked, "And when you tell her, do you make it clear to her or advise her not to tell anybody?" JB responded, "I never told her about that incident, just about the other times."

[¶43] Mr. O'Dell immediately objected and moved for a mistrial "on the basis of a 404(b) violation." He argued that the testimony improperly referred to uncharged misconduct and that the State had not provided the required pretrial notice to introduce such evidence.

[¶44] The State responded that a mistrial was not warranted. The district court sustained the objection and struck the testimony, noting that the question "was not tailored to elicit [the stated] information," and was "produced organically from the witness." The court found no intentional violation and denied the motion for mistrial. The court further instructed the jury to disregard the testimony. The court recognized the precarious nature of the testimony but concluded that a mistrial was unnecessary.

[¶45] Implicit in the district court's sustained objection and its instruction to the jury to disregard the testimony was that the testimony was inadmissible under WRE 404(b). *See Reay v. State,* 2008 WY 13, ¶ 16, 176 P.3d 647, 652 (Wyo. 2008) (finding the victim's testimony in that instance was evidence of uncharged misconduct). However, in *Reay*, we held that there was no reasonable possibility that the verdict might have been more favorable to the defendant without the testimony. *Id.* at ¶ 17, 176 P.3d at 652.

[¶46] We conclude similarly here. The district court struck the testimony and instructed the jury to disregard it. A trial error may be corrected by an appropriate curative instruction. In addition, we presume jurors follow the court's instructions. *Carrier v. State,* 2017 WY 88, ¶ 40, 400 P.3d 358, 367 (Wyo. 2017) *(quoting Bruce v. State*, 2015 WY 46, ¶ 75, 346 P.3d 909, 931 (Wyo. 2015)) (other quotations omitted). Generally, when improper testimony is stricken and the jury is instructed to disregard it, the instruction is deemed sufficient to prevent prejudice. *Carrier,* ¶ 40, 400 P.3d at 267 (citing *McGill*, ¶ 12, 357 P.3d at 1145). We have repeatedly reaffirmed this presumption and do so again here. *See Willoughby v. State,* 2011 WY 92, ¶ 11, 253 P.3d 157, 161 (Wyo. 2011) ("We have said many times that a trial error may be corrected by an appropriate curative instruction, and that we presume that jurors follow the court's instructions."). The district court did not abuse its discretion when it denied Mr. O'Dell's request to declare a mistrial.

[¶47] Mr. O'Dell also contends the district court erred when it overruled his objection and denied a mistrial after JB testified on redirect that Mr. O'Dell sent her a note that said, "if I got my best friend … or my babysitter … to basically take my spot, then he would stop with me." Mr. O'Dell objected, and the court held a sidebar conference out of the presence of the jury, during which Mr. O'Dell again moved for a mistrial based on alleged uncharged character evidence.

[¶48] Having previously ruled the State could inquire about the notes, the district court concluded the testimony did not imply conduct beyond the charged offense and denied the motion for mistrial. We agree. The note could reasonably be understood to reference the conduct for which Mr. O'Dell was charged, and nothing more.

[¶49] In addition, and even if the testimony implied conduct beyond the charged offense, JB provided no details regarding when or where any conduct occurred, nor did she describe any distinct act separate from the charged offense. The testimony was therefore too ambiguous to constitute evidence of uncharged misconduct under Rule 404(b). *See Reay,* ¶ 12, 176 P.3d at 651. Additionally, Mr. O'Dell first elicited the testimony about the notes while cross-examining JB, which was his prerogative to do. *See Cazier v. State,* 2006 WY 153, ¶ 33, 148 P.3d 23, 24 (Wyo. 2006). However*,* "[w]hen the defendant initiates a line of questioning, the prosecutor is entitled to make a permissible inquiry without crossing into prosecutorial overkill." *Id.* (citation omitted). The district court did not abuse its discretion when it overruled the objection and denied Mr. O'Dell's motion for a mistrial.

### III. In the absence of multiple errors, cumulative error cannot exist.

[¶50] "The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." *King v. State,* 2023 WY 36, ¶ 51, 527 P.3d 1229, 1246-47 (Wyo. 2023) (quoting *Hicks v. State,* 2021 WY 2, ¶ 40 , 478 P.3d 652, 663 (Wyo. 2021)) (other citation omitted). Because there are not two or more instances of error here, we do not consider Mr. O'Dell's cumulative error argument.

### CONCLUSION

[¶51] The district court did not abuse its discretion or violate the Confrontation Clauses of the United States or Wyoming Constitution when it limited his cross-examination of the victims related to their violations of a sequestration order. The district court also did not abuse its discretion in two instances when it denied Mr. O'Dell's motions for mistrial. Finding no error, we affirm.